JAMES IMBRIE ET AL., PLAINTIFFS-RESPONDENTS, v. LLOYD B. MARSH ET AL., DEFENDANTS-APPELLANTS.

Argued January 3, 1950—Decided January 9, 1950.

*Mr. Benjamin C. Van Tine* argued the cause for the appellants (*Mr. Theodore D. Parsons,* Attorney General, attorney).

*Mr. Leo Blumberg* argued the cause for the respondents (*Mr. Morton Stavis,* attorney).

The opinion of the court was delivered by

VANDERBILT, C. J.   The present action was commenced by the nominees of the Progressive Party for Governor and members of the State Legislature in the general election of 1949, and the Progressive Party, for an injunction restraining the defendants, the Secretary of State and the several county clerks, from printing the legend "refused oath of allegiance" under the names of the individual plaintiffs on the ballots to be used in the general election and also to prohibit generally the defendants from enforcing in any manner Chapters 21, 22, 24 and 25 of the Laws of 1949, and for a declaratory judgment that these statutes are in violation of the Constitutions of New Jersey and of the United States and therefor void. On motion of the defendants the Chancery Division of the Superior Court dismissed the complaint, sustaining the four acts in question, but on appeal the Appellate Division reversed the judgment below, holding that so much of the challenged legislation as was applicable to the Governor and the members of the Legislature and candidates for those offices was unconstitutional and void.   From that determination the defendants have appealed to this court.

The issues to be decided here are of fundamental importance, first, because they involve the construction of two sections of our new Constitution, and secondly, because they

concern oaths as to which it has been well said "No country can subsist a twelve-month where an oath is not thought binding; for the want of it must necessarily dissolve society," *Omychund v. Barker,* 1 *Atk.* 21, 34 (*Ch.* 1744). The oath has played a significant part in government from the earliest times; thus we find Lycurgus saying to the Athenians: "An oath is the bond that keeps the state together," *Oratio in Leocratem* 80, and Montesquieu attributing the strength of the Romans to their respect for an oath: "Such was the influence of an oath among these people that nothing bound them stronger to the laws. They often did more for the observance of an oath than they would have done for the thirst of glory or the love of their country," *The Spirit of the Laws, Book VIII, c.* 13. Wigmore has traced the long history of the oath from its "summoning of Divine vengeance upon false swearing," to "a method of reminding the witness of the Divine punishment somewhere in store for false swearing," 6 *Wigmore on Evidence* 285. The importance of the oath in judicial proceedings cannot be overestimated; the judge on the bench, the jury in the box, the attorneys at the counsel table, the witness on the stand, the court stenographer taking a record of the proceedings, and even the bailiffs when they retire to guard the jury in its deliberations, are all sworn to do their respective duties before they are permitted to act. The responsibilities of members of the Legislature and other state officers are certainly of no less importance to the public welfare.

An oath of allegiance was first prescribed in this State on September 19, 1776, within three months after the adoption of our first Constitution, *P. L.* 1776, *c.* 2 (*Wilson, p.* 1), in the following terms:

"I AB do sincerely profess and swear, (or, if one of the People called Quakers, affirm) That I do and will bear true Faith and Allegiance to the Government established in this State under the Authority of the People. So help me God."

This precise language with the omission of the clause in parentheses, which is provided for elsewhere, has been carried

forward through successive revisions and compilations into the Revised Statutes of 1937, 41 :1–1.

This statute was amended by *P. L.* 1949, *c.* 21, the first of the acts under attack, to read as follows:

"41 :1–1. Every person who is or shall be required by law to give assurance of fidelity and attachment to the Government of this State shall take the following oath of allegiance:

'I, ................., do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of the State of New Jersey, and that I will bear true faith and allegiance to the same and to the Governments established in the United States and in this State, under the authority of the people; and will defend them against all enemies, foreign and domestic; that I do not believe in, advocate or advise the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in the Government established in the United States or in this State; and that I am not a member of or affiliated with any organization, association, party, group or combination of persons, which approves, advocates, advises or practices the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in either of the Governments so established; and that I am not bound by any allegiance to any foreign prince, potentate, state or sovereignty whatever. So help me God.' "

An official oath of office was first provided in 1799 (*Paterson, p.* 377) in the following· terms:

"VII. And be it enacted, that where· the form of an official oath is not or shall not be specially prescribed, then one shall be taken in the following words, to wit:

I, ...·............ ..., do solemnly promise and swear, that I will faithfully, impartially, and justly perform all the duties of the office of                according to the best of my abilities and understanding. So help me God."

This oath was likewise re-enacted in successive revisions and compilations. By *P. L.* 1920, *c.* 215 (2 *Cum. Suppl.* 1924, 2564) this simple oath was enlarged by prefixing to it an oath to support the Constitution of the United States and the Constitution of New Jersey. The new oath, moreover, was "in addition to any official oath that may be specially prescribed" and to the oath of allegiance first mentioned herein and applied to "every person hereafter elected or appointed

to any public office in this state or in any county or municipality therein."

This statute which was carried into the Revised Statutes of 1937, 41:1–3, was amended by *P. L. 1949, c. 22,* the second of the four acts under review, to read as follows:

"41:1–3. In addition to any official oath that may be specially prescribed, the Governor for the time being and every person who shall be elected, appointed or employed to, or in, any public office, position or employment, legislative, executive or judicial, or to any office of the militia, of, or in, this State or of, or in, any department, board, commission, agency or instrumentality of this State, or of, or in, any county, municipality or special district other than a municipality therein, or of, or in, any department, board, commission, agency or instrumentality thereof, and every counsellor and attorney-at-law, shall, before he enters upon the execution of his said office, position, employment or duty take and subscribe the oath of allegiance and office as follows:

'I, . . . . . . . . . . . . . . . . . . . . ., do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of the State of New Jersey, and that I will faithfully discharge the duties of . . . . . . . . . . . . . . . . ., according to the best of my ability.

I do further solemnly swear (or affirm) that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of this State and to the Governments established in the United States and in this State, under the authority of the people; and will defend them against all enemies, foreign and domestic; that I do not believe in, advocate or advise the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in the Government established in the United States or in this State; and that I am not a member of or affiliated with any organization, association, party, group or combination of persons, which approves, advocates, advises or practices the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in either of the Governments so established; and that I am not bound by any allegiance to any foreign prince, potentate, state or sovereignty whatever. So help me God.' "

This "oath of allegiance and office" includes not only an oath of office but everything in the "oath of allegiance" *P. L. 1949, c. 21, in haec verba.* It was stated at the oral argument that it has not been the practice to administer both the oaths prescribed in *P. L. 1949, c. 21* and *c. 22,* but to consolidate them, thus avoiding the redundancy of language therein. That, however, has not been the practice in this court in

administering oaths to judges, counsellors at law, and attorneys at law. Unless and until these acts are declared unconstitutional, everyone taking an oath is obligated to take it in the form and language prescribed by the Legislature.

*P. L.* 1949, *c.* 24, the third of the acts under consideration, requires all candidates for nomination or for election to any public office or party position to subscribe and file the oath of allegiance prescribed in *R. S.* 41:1–1, as amended by *P. L.* 1949, *c.* 21, and provides further that should any candidate fail to file the oath "the nomination or election of such candidate * * * shall be null and void."

*P. L.* 1949, *c.* 25, the fourth of the acts under scrutiny, provides that every candidate for public office to be voted on at the general election in 1949 shall subscribe and file the oath of allegiance set forth in *R. S.* 41:1–1 as amended, and, in the event of his failure to so subscribe and file, that "there will be printed under his name on the military service ballot, the sample ballot, and the official ballots to be used at such general election, the legend "refused oath of allegiance."

All of these statutes of 1949 must be viewed in the light of the pertinent provision of the Constitution of 1947, which prescribes in Article IV, Section VIII, paragraph 1, the oath for members of the Legislature:

"I do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of the State of New Jersey, and that I will faithfully discharge the duties of Senator (or member of the General Assembly) according to the best of my ability."

and in Article VII, Section I, paragraph 1, the oath for all state officers:

"Every State officer, before entering upon the duties of his office, shall take and subscribe an oath or affirmation to support the Constitution of this State and of the United States and to perform the duties of his office faithfully, impartially and justly to the best of his ability."

These two paragraphs of the Constitution bring us to the fundamental question before us: Are these oaths, embodied in the Constitution of 1947, exclusive as to the members of

the Legislature and state officers and therefore beyond the power of the Legislature to add to, subtract from, or in anywise vary?

To ask the question is to answer it, for if the Legislature may alter these oaths or any other provisions of the Constitution prescribing the qualifications for office (such as age, citizenship, residence and prohibition of dual office holding) it would to the extent of such variance nullify the Constitution. The maxim *expressio unius est exclusio alterius,* is peculiarly applicable here. Such has been the current not only of decisions in this State and elsewhere but of the authorities on public law. "Where the constitution prescribes the manner in which an officer shall be appointed or elected, the constitutional prescription is exclusive and it is not competent for the legislature to provide another mode of obtaining or holding the office." *Johnson v. State,* 59 *N. J. L.* 535, 536, 538 (*E. & A.* 1896). An act that disqualified from voting or holding office persons convicted of crime other than those expressly enumerated in the Constitution was held unconstitutional in *State v. Carrigan,* 82 *N. J. L.* 225 (*Sup. Ct.* 1916); "We think that the legislation is unconstitutional because it undertakes to add to the qualifications of voters as prescribed in the constitution itself." A statute limiting to freeholders the right to vote for road commissioners was declared unconstitutional as contrary to the provisions of the Constitution of 1844 defining the qualifications for voting; "The class of voters at official elections being thus described by the constitution, it is not competent for the legislature either to enlarge or diminish such class. The authorities, it is believed, are unanimous," *Allison v. Blake,* 57 *N. J. L.* 6; 11 (*Sup. Ct.* 1894). This line of constitutional construction is peculiarly appropriate in a government dependent on public elections and where by the Constitution "all political power is inherent in the people," Article I, paragraph 2.

The recognized authorities on public law are in accord:

"It would seem but fair reasoning upon the plainest principles of interpretation, that when the Constitution established certain qualifications as necessary for office, it meant to exclude all others as pre-

requisites. From the very nature of such a provision the affirmation of these qualifications would seem to imply a negative of all others * * *. A power to add new qualifications is certainly equivalent to the power to vary them." 1 Story, *Commentaries on the Constitution*, § 625.

"The legislature cannot add to the constitutional qualifications of an officer." 1 *Cooley on Constitutional Limitations*, 140.

"It is obviously beyond the power of the legislature in prescribing the oath to be administered to impose upon the officer tests or requirements greater than those which the constitution has declared shall be sufficient." *Mechem on Public Offices and Officers*, 164 (1890).

See also *State ex rel. Chenowith v. Acton*, 31 *Mont.* 37, 77 *Pac.* 299 (*Sup. Ct.* 1904); *People ex rel. Brecken v. Board of Election Commissioners*, 221 *Ill.* 9, 77 *N. E.* 321 (*Sup. Ct.* 1906); *People ex rel. Hoyne v. McCormick*, 261 *Ill.* 413, 103 *N. E.* 1053, *Ann. Cas.* 1915A, 338 (*Sup. Ct.* 1913); *Hoffman v. Downs*, 145 *Minn.* 465, 177 *N. W.* 669 (*Sup. Ct.* 1920); *Buckingham v. State*, 3 *Terry* (42 *Del.*) 405, 35 *A.* 2d 903 (*Del. Sup. Ct.* 1944); *Kivett v. Mason*, 185 *Tenn.* 558, 206 *S. W.* 2d 789 (*Sup. Ct.* 1947).

In spite of these authorities and the decisions here and elsewhere, the defendants argue that because our Legislature has prescribed by statute an oath of allegiance since the early days of our independence and its right to do so has not been challenged for over 150 years, the Legislature has acquired an inherent right to require an oath of allegiance as a qualification for office in addition to the oaths required by our Constitution. That no one has seen fit to challenge the constitutional power of the Legislature to prescribe a simple oath of allegiance cannot be deemed to be controlling, especially when the oath of allegiance prescribed until last year so closely approached the terms of the oaths set forth in the Constitutions of 1844 and 1947 as to be quite indistinguishable from them and therefore to be entirely unobjectionable.

Indeed, the history of the oath of allegiance and other tests for office holding in England and in the Colony of New Jersey constitute convincing proof of the historical unsoundness of the defendants' contention as well as persuasive support of the exclusive nature of the oaths incorporated in our Con-

stitution. This history is an involved one but the matter is one of such paramount importance and not without present-day significance that we deem it essential to go into the matter at this point. The most compact summary I have been able to find of the history of the oath of allegiance is from the pen of the most brilliant of English legal historians:

"The history of parliamentary oaths and religious disabilities * * * begins in 1562 with the statute 5 Eliz., c. 1, 13, which required every member of the House of Commons to take the oath of supremacy—to swear that the queen is only supreme governor of this realm as well in spiritual as in temporal causes, and that no foreign person or potentate has any authority ecclesiastical or spiritual within this realm. In 1609 an oath of allegiance was added (7 Jac. 1, c. 6), to the effect that the king is lawfully king, and that the pope has no power to depose him. In 1678 (30 Car. II, stat. 2, c. 1) to these oaths was added a declaration against transubstantiation, the invocation of saints and the sacrifice of the mass: and the two oaths and this declaration were required of lords as well as commons. The doors of both Houses were thus effectually closed to members of the Roman Church; some of them might be ready to take the two oaths which related to church government, but the declaration as to doctrine was utterly incompatible with their most fundamental beliefs. Immediately after the Revolution the two oaths of allegiance and supremacy were altered in form, the first was to be merely this, 'I will be faithful and bear true allegiance to King William and Queen Mary;' the second was 'I do abhor as impious and heretical the damnable doctrine and position that princes excommunicated by the Pope or any authority of the see of Rome may be deposed or murdered by their subjects or any whatsoever, and I declare that no foreign prince or person hath or ought to have any jurisdiction or authority ecclesiastical or spiritual within this realm.' The declaration against transubstantiation was still maintained. An act of 1701, added a third oath, known as the oath of 'abjuration,' it is long and of a more political character: the swearer abjures all allegiance to the pretended Prince of Wales, and promises to maintain the royal succession as fixed by the Bill of Rights and the Act of Settlement, and this he does upon the true faith of a Christian.

"The persons who were thus excluded were members of the Roman Church, persons who objected to oaths, and persons who were not Christians: Quakers we may say, and Jews. In 1696 (7 and 8 Will. III, c. 27) the oaths of allegiance and supremacy were required of the electors as well as the elected; and the electors had also to take the oath of abjuration. In 1696 Quakers were permitted to make an affirmation instead of taking an oath. On the accession of George I, the oaths were slightly altered. Catholics then could not sit in either House until 1829, and properly speaking they could not vote

in parliamentary elections, but the business of tendering oaths to the voters had made elections so very long, that it was not gone through unless the candidates required it, and statute (1794, 34 Geo. III, c. 73) permitted this omission, so I daresay that Catholics did vote. The Catholic Relief Act of 1829 (10 Geo. IV, c. 7) substituted another oath which Catholics could take—they had to swear allegiance, and also that the pope had no *civil* jurisdiction or authority within this realm, and that they would not subvert the church establishment or exercise any privilege to weaken the Protestant religion in this kingdom. The Catholics who would take this oath were thus enabled to sit in either House, and vote at parliamentary elections: Catholics in holy orders were, however, expressly excluded from the Commons' House. In the previous year, 1828, a great measure of relief had been given to all non-conformists, by what is generally called the repeal of the Test and Corporation Acts (the Test Act was not wholly repealed), but this does not concern us, the Protestant dissenter had not been excluded from parliament nor from voting in parliamentary elections, but he had been excluded from many offices by a requirement that he should take the sacrament. This requirement, ever since 1727, had been evaded by the passing of annual bills indemnifying those office-holders who had failed to take the sacrament. In 1828 a declaration was substituted for the sacramental test, a declaration to the effect that the declarant would not use his privileges to the injury of the established church. The necessity of making such declaration was removed in 1868 (31 and 32 Vic., c. 72)." Maitland, *The Constitutional History of England*, 364-366 (1931).

It is instructive to observe that all of the oaths before 1776 mentioned by Maitland are to be found set forth at length in chapter 105 of *Allinson's Acts* (1776), which, it will be recalled, was given the force of law by Article XXI of the Constitution of 1776 "until altered by the legislature of this colony (such only excepted as are incompatible with this Charter)." This act was passed in 1722 and the oath of allegiance given therein was as simple and forthright as our own oath of allegiance:

"I AB do sincerely Profess and Swear that I will be faithful and bear true Allegiance to his Majesty King George. So help me God." (*Ibid.* 63)

The Oath of Supremacy, the Oath of Abjuration and the Declaration against Transubstantiation, the Invocation of Saints and the Sacrifice of the Mass, on the contrary, were

verbose in language and controversial in tone. Elaborate provisions were provided in the act for two or more justices of the peace tendering the several oaths to any person suspected of being dangerous or disaffected, for taking him before the Governor in Council, and binding him over to appear before the next term of the Supreme Court, where if he still refuses to take the oaths he shall "be deemed a popish, recusant convict and as such be proceeded against." Thus does History both in England and in the Colony of New Jersey exhibit the danger, both religious and political, of legislative oaths.

The only oath for office holders which survived the Declaration of Independence was the oath of allegiance which was re-enacted in substance on September 19, 1776, and which remained on the statute books unamended and unchallenged until 1949.

It is urged on us that there was an oath for legislators prescribed by the Constitution of 1776 but that notwithstanding the existence of this oath the Legislature promptly enacted an oath of allegiance. The constitutional oath for legislators is embodied in the final article of the Constitution of 1776 and must be quoted in full because of the light which it sheds on the nature of that Constitution:

"XXIII.  That every person, who shall be elected as aforesaid, to be a member of the legislative council, or house of assembly, shall, previous to his taking his seat in council or assembly, take the following oath or affirmation, viz.: 'I, A.B., do solemnly declare, that as a member of the legislative council or assembly (as the case may be) of the colony of New Jersey, I will not assent to any law, vote, or proceeding, which shall appear to me injurious to the public welfare of said colony; nor that shall annul or repeal that part of the third section in the charter of this colony, which establishes that the elections of members of the legislative council and assembly shall be annual; nor that part of the twenty-second section in said charter, respecting the trial by jury; nor that shall annul, repeal, or alter any part or parts of the eighteenth or nineteenth sections of the same (dealing with freedom of religion).' And any person or persons, who shall be elected as aforesaid, is hereby empowered to administer to the said members the said oath or affirmation."

It is important to recall that the Constitution of 1776 was a revolutionary document, adopted two days before the Decla-

ration of Independence without any ratifying vote of the
people, after two days of drafting in committee, two and one-
half days of discussion by the committee of the whole, and
one day of deliberation in the Provincial Congress, *Erdman,
The New Jersey Constitution of 1776, pp.* 31–33 (1919). As
will be seen from Article XXIII above quoted, the Constitution
of 1776 was deemed by its framers to be merely a statute,
albeit an important statute, of the type of Magna Carta, but
nevertheless a statute amendable by any Legislature created
under it except insofar as the oath of the members of the
Legislature precluded them from amending the four articles
of the Constitution enumerated in Article XXIII. With this
view of the nature of the Constitution it could not be con-
tended that the oath of allegiance of September 19, 1776, was
in anywise unconstitutional.

Equally significant is the course of events in the Constitu-
tional Convention of 1844. The members of the Convention
had before them for debate a report containing the following
paragraph:

"7. Members of the legislature, and all officers commissioned by
authority of this state, shall, before they enter on the duties of their
respective offices, take and subscribe the following oath and affirma-
tion: 'I do solemnly swear, or affirm, as the case may be, that I will
support the constitution of the United States and the constitution
of the State of New Jersey, and that I will faithfully discharge the
duties of the office of ........ .........., according to the best of
my ability.' And members elect of the Senate or General Assembly
are hereby empowered to administer to each other the said oath or
affirmation." *Proceedings of the New Jersey Constitutional Conven-
tion of 1844,* 366.

The discussion on this paragraph is illuminating as to the
reasons for amending this paragraph before its insertion in
the Constitution of 1844 as Article IV, Section VIII, para-
graph 1 (incorporated in the Constitution of 1947, Article
IV, Section VIII, paragraph 1). First "Mr. Naar moved
to amend so as to require all officers to take, in addition to
the oath prescribed in the report for all officers, the oaths now
prescribed by law: but a general repugnance being expressed

by the Convention to the multiplication of oaths, the motion was withdrawn." (*Ibid.* 393) "Mr. Gilchrist moved to amend so as to authorize the Legislature to prescribed other forms of oaths or to dispense with them entirely." "Mr. Hornblower seconded this amendment, as he said it would be in the power of the Legislature, if public sentiment should change on this subject, to act in accordance with it." "Mr. Naar suggested that this was going too far, as it would leave it in the power of the Legislature to fix a test, or a religious oath, and he was sure no one was prepared to submit to that." (*Ibid.* 394) "Mr. Jaques moved to strike out *'and all officers commissioned by authority of this state.'*" "Mr. Jaques' amendment was agreed to. He then moved to strike out words *'of the office of'* and insert 'of senator or member of the general assembly as the case may be,' which was agreed to." (*Ibid.* 395.)

In the face of this debate, out of which grew the constitutional oath for legislators, the re-enactment in *P. L.* 1846, *c.* 25 (*p.* 866), of the oath of allegiance of September 19, 1776, cannot be deemed a contemporaneous construction of the intent of the Constitutional Convention insofar as any statutory oaths for members of the Legislature are concerned. The constitutional oath prescribed for members of the Legislature was exclusive and beyond the power of legislative interference, though the Legislature was still free to prescribe the oath of allegiance for all other officers commissioned by the State, the Constitutional Convention having struck down any constitutional oath for state officers generally.

There seems to have been nothing said either on the floor of the Constitutional Convention of 1947 or in its Legislative Committee on the subject of the constitutional oath for legislators. Indeed, the only reference to the subject in the records of the Constitutional Convention of 1947 is in a pamphlet entitled "Report of the Legislative Committee, July 31, 1947," where on pages 12 and 14 it is said:

"The Committee proposes that the following provisions of the existing Constitution be retained without substantial change: * * * Paragraph 21. The provisions relating to the form of oaths of members and officers of the legislature."

Nor was there any debate either in the Constitutional Convention or any committee on the subject of the oath for state officers prescribed in Article VII, Section I, paragraph 1, of the new Constitution that supplies the lack of a constitutional oath for state officers generally that existed in the Constitution of 1844. The only record of this matter anywhere in the proceedings of the Constitutional Convention of 1947 is that on July 1st Mrs. Edwin Bebout, speaking as a representative of the League of Women Voters before the Committee on the Executive, Militia and Civil Officers, stated:

"We suggest that every appointive state officer should take an oath to support the Constitutions of the United States and New Jersey as do now the members of the Legislature."

The substance of Article VII, Section I, paragraph 1, is derived, as are a considerable number of the other provisions of the Constitution of 1947, from Article VI, Section I, paragraph 1, of the draft of the Constitution Revision Commission of 1941 (Report, p. 50).

Thus, there is nothing in the history of either the Constitutional Convention of 1844 or of the Constitutional Convention of 1947 that lends countenance to the idea that the Legislature was authorized to impose oaths in addition to those set forth in the Constitution on the classes of public officials covered hereby. In the view that we take of the exclusive nature of an oath prescribed in the Constitution, Chapters 21, 22, 24 and 25 must be declared unconstitutional and void. Having reached this conclusion, it therefore becomes unnecessary for us to consider the other grounds on which these four statutes have been challenged.

This decision in nowise affects the duty of allegiance owed by a legislator or state officers generally to the State. Even though it is beyond the power of the Legislature to prescribe an oath of allegiance for members of the Legislature and other state officers, they are nevertheless bound, along with every other citizen, in their allegiance to the State even in the absence of an oath; "All subjects are equally bounden to their allegiance as if they had taken the oath; because it is written by the finger of the law in their hearts, and the taking

of the corporal oath is but an outward declaration of the same," 2 *Coke's Institutes,* 121; see also 3 *Stubbs, The Constitutional History of England,* 555, and 1 *Blackstone's Commentaries* 369, where it is said: "Natural allegiance is such as is due from all men born within the king's dominions immediately upon their birth." Allegiance, which at first was purely personal owing from the subject to the king as part of the feudal law, 3 *Holdsworth's History of Engalish Law* 56, 461, has long since become territorial in this country and owing from the citizen to his State, 9 *Idem* 73, 1 *Burgess, Political Science and Constitutional Law* 51. Not only does the duty of allegiance continue but it would seem, moreover, to be difficult, if not impossible, to state the distinction between the scope of our traditional oath of allegiance before 1949 and the scope of an oath to support the Constitution.

The judgment below is affirmed.

OLIPHANT, J. (dissenting opinion). It is important in this discussion to bear in mind the distinction between an oath of allegiance and an oath of office. An oath of office needs no definition; it is self-defining. I deem it necessary, however, to state my understanding of what an oath of allegiance is under our form of government and to whom and in what form the allegiance is due.

Allegiance in its application to the subject of a sovereign goes back to early English history. Lord Coke says (1 *Coke on Littleton,* 129 a): "Allegiance or ligeance is that lawful obedience which a subject is bound to render to his sovereign." *Blackstone* (1 *Bl. No.* 366 *et seq.*) calls it the tie or ligamen which binds the subject to the King, in return for that protection which the King offers the subject.

There are marked distinctions between the allegiance due by a subject and the allegiance due by a citizen which need not be elaborated on here. When we speak of citizens, we mean the people of a free government and the relation in which they stand to their government, incurring as it does an obligation to support the institutions of freedom thereunder; and every citizen and officer thereof is bound to yield obedience to the

government. With us, the people organized as a government are sovereign, and the citizen owes a duty to that sovereignty.

In this country, due to our form of government, the citizen is under two sovereignties, the State and the United States, but his obligation is not inconsistent with itself because these sovereignties operate one within the other, and there is no conflict. It is commonly accepted language to speak of the government of the United States as a sovereignty, and such it is; and to speak of the several states as sovereign states, for such they are. Allegiance is the tie which binds the citizen and the state just as it is the tie which binds him to the United States. The state, of course, stands in a lesser degree but is a part of the whole.

It is not an unseverable bond. A citizen may even divest himself of citizenship in the United States and may become an expatriate, but while the relationship exists, there are mutual obligations. There are obligations from the sovereign country or state to the citizen, and obligations from the citizen to the sovereign. Those of us who were born into citizenship in this great country may hold our possession rather lightly, but there are those in other parts of the world who would give all they possess of worldly goods to gain that great prize and who would give life itself if, by so doing, they could bring that citizenship and the protection that goes with it to those they love.

It is manifest that government, if it is to continue, must have the loyalty of its citizens or, putting it in another way, the people, acting as a whole through their various orderly processes, must have in this common enterprise, the support of the individuals who hold themselves forth as being members of this organized society and who accordingly receive the reciprocal benefits.

Ours—both state and nation—is a constitutional government, not constitutional in the sense of the British constitution—a collection of customary or unwritten constitutions which may be changed by parliamentary action—but in the sense of a written or rigid constitution which may be changed only in accord with its own provisions or, in the case of a

state, by a new constitution, formed as it was formed by an orderly assembly of representatives or delegates from and elected by the people in orderly democratic fashion within the concept of law and acting as an agency of constitutional government.

Allegiance involves the obligation to obey and the duty to protect. It is a duty to obey the command of a sovereign and involves the duty to preserve, protect and defend the Constitution. In this form, the duty is most suitable for a republic. Indeed it is actually more comprehensive than the other oaths of allegiance of which I have spoken. A breach of it may constitute treason; but in many ways the oath may be violated by acts inferior to treason. The oath usually required of this country, then, embraces all the oath of allegiance can embrace and much more.

Our duty is obedience to the government of the people, and if I believed there was any other duty, it would carry with it unimaginable terror, for the reason we could not know our duty or who has the right to command it. The great Italian historian Guglielmo Ferrero has admirably described the great fear that seizes a government which knows itself to be contested and illegitimate. "Power is condemned to live in terror," wrote Ferrero, "because in order to govern, it uses violence and terror. Its subjects fear the arbitrary power which they must obey, while that power itself fears the subjects whom it commands. Cain fears Abel; that is why he ends by slaying him. Here is the explanation of the Holy Fear of dictatorship; it is merely the fear inherent in power, fear of the revolt of its subjects, a fear which from the very outset seizes upon all powers that are founded on force."

True allegiance to an established government under our system does not negate the right of the people to alter or abolish it whenever the form of the government becomes destructive of the ends for which it was created by the people. But the exercise of this power is not revolutionary within the meaning of the term as I understand it.

We have lately experienced in our State a change of government by constitutional method under legislative sanction, and

with cooperative action by all of the people, first by electing delegates and finally by approval of .the result reached by those delegates by the people in a regularly constituted election. I look upon that as a pursuit of constitutional methods.

The system of government having been established, it must itself govern, as well in the matter of reproducing or repairing itself as in that of protecting itself and its subordinate members from the operation of harmful agencies without. A government, once founded, is the people, as organized for the attainment of the ends of government. Neither a part of the people, in their individual capacity, nor acting as a dissociated, non-organized mass, are legally competent to change their political structure. If that is to be done at all, consistently with the integrity of the government, or with the safety or happiness of the citizens, it must be done through the people themselves, as organized for the purposes of government. In a word, it is a right of the governed to know where to look for lawful successors to the institutions and magistrates under which they now live—a thing impossible except when the succession takes place according to law.

Revolution, as I understand the term, is a political act or acts done in violation of law, or without law. The act is a political one and is not to be confused with the ordinary misdemeanors or felonies. Such an act, to be revolutionary, accordingly, must be done either, first, in violation of law; that is, of the Constitution, or of the customary or statute law, including in the term law, the letter, together with its necessary implications; or, secondly, without law; by which is meant, that the act must rest, for its warrant, on abstract considerations, such as physical power, necessity, or natural equity, and not upon the authority of the existing social order, to which it is extrinsic or hostile.

It is the hostility to the established law both constitutional and statutory that marks an act or purpose revolutionary. If it results successfully, it lays the foundation for a new order of things or government. If it fails, he who did it is subject to the penalties under the established system.

From time to time we read of an overthrow overnight or in a few minutes of a government by mere physical seizure, a superiority of might applied at a crucial time and place. That is an illustration of a change in government by unconstitutional methods.

I have spoken of revolution in rather abstract terms, but a revolution today is unlike a revolution in the sense of which I have spoken. It is much easier in our day to start a revolution than to end one. It is much easier to succumb by surprise to a dictatorship than to get rid of it. When a revolutionary or dictatorial regime, which can be assumed to be familiar with the technique of a *coup d'etat,* makes every effort to maintain itself in power and to defend itself by all the modern arms of which the State today disposes, it would be astounding if a revolt or a counter-revolution were ever to break out.

In this way, the revolution escapes from the people, and is no longer subject to the influence of the masses, of the nation. It becomes identified with authority, by which it is absorbed. Authority then becomes an end in itself. To remain in power against all and everything, to make of power the supreme, exclusive and permanent attribute of the party and its leaders, to sacrifice for this object all ideas and all men who become troublesome or superfluous, is the end to which a totalitarian regime naturally and inevitably tends today.

The struggle against a subject or a citizen in such a regime loses its revolutionary character; it soon ceases to be a question of doing violence to an individual with the object of correcting and improving him. The problem becomes one of keeping him in subjection just because he is a man, because his natural human reactions, unless they are crushed beforehand, might lead him to contest the legitimacy of the dictatorial power as seized. It is this total rupture of the rights of a subject or citizen as a man or person that seems to be the distinctive trait of a revolution by force or violence where it is experienced today.

Therefore, I am of the firm opinion that true allegiance to our established system of government negates the right of

any citizen or person to attempt to alter or abolish the form of our government by the use of force or violence or other unconstitutional or unlawful means; and I understand the word "unlawful" to mean any violation of constitutional limitations and as synonymous with "unconstitutional."

Our allegiance is to the Constitution of the United States and the Constitution of the State, and it is a duty which by those instruments is demanded and is commanded to be discharged, and obedience must follow on each and every day from everyone who lives under the government thus set up.

I regard an oath of allegiance as an oath that the affiant will bear true faith and allegiance to the constitution established under the authority of the people, that he will defend against all enemies, foreign and domestic, that he does not believe in the use of force and violence by himself or others for the overthrow of the established government, that he is not a party, either directly or through others, to such a destructive effort, and that he owes no allegiance to a foreign sovereignty or an enemy of our own sovereignty.

I do not understand how a democratic government may endure if its citizens are not in such position of mind and circumstance as to be able truthfully to subscribe to such an oath if required, and I do not understand why a good citizen should, if required, hesitate to subscribe to such an oath.

The views expressed above defining the sovereignty to which the allegiance of a citizen of this State is due is in accord with the decisions in *Chisholm v. Georgia,* 2 *Dall.* 419, 1 *L. Ed.* 440; *Penhallow v. Doane,* 3 *Dall.* 54, 1 *L. Ed.* 507; *Fletcher v. Peck,* 6 *Cranch.* 87, 3 *L. Ed.* 162; *Martin v. Hunter,* 1 *Wheat.* 304, 4 *L. Ed.* 97; *McCulloch v. Maryland,* 4 *Wheat.* 316, 4 *L. Ed.* 579; *Cohens v. Virginia,* 6 *Wheat.* 264, 5 *L. Ed.* 257; *Gibbons v. Ogden,* 9 *Wheat.* 1, 6 *L. Ed.* 23; *Buffington v. Day,* 11 *Wall.* 113, 20 *L. Ed.* 122; see also *Kersting v. Hardgrove,* 24 *N. J. Misc.* 243 (*Cir. Ct.* 1946).

My views above follow recognized authorities and are in accord with the arguments advanced and the decisions in the Allegiance Cases, *State ex rel. Ed. McCready v. Hunt,* and *State ex rel. McDaniel v. McMeekin,* 2 *Hill* 1, 19 *S. C.* 1

(1834). In *Jameson Constitutional Conventions* (1887) the
author, referring to these two cases, said: "No constitutional
question has ever been discussed with greater ability and
learning in the United States, than were those raised in these
cases."

I shall now proceed to examine the various questions pre-
sented by this case in the light of the foregoing considerations
and principles and proceed directly to examine the applic-
ability of the constitutional provisions as to allegiance, both
federal and state, together with the applicable implementing
statutes which prescribe the forms of the required oaths of
allegiance.

The oath of allegiance of the people of this colony of New
Jersey to the King of Great Britain is found in Chapter 105,
Allison's Laws (1776). I agree with the majority as to the
vice of that oath as an invasion of the freedom of conscience
and expression and religion. I do not agree that the vices
inherent therein are authority for the exclusive nature of the
one oath incorporated in our Constitution. Nor do I agree
that this oath was given any real force by Article XXI of the
Constitution of 1776, adopted July 2, 1776, and the Declara-
tion of Independence, adopted July 4, 1776.

From either of these dates the oath to the British crown
was without efficacy, because ours became a revolutionary gov-
ernment, insofar as allegiance to the British government was
concerned. Not only was the Continental Congress a revolu-
tionary body but the convention which adopted our Constitu-
tion was a revolutionary convention, although the Constitu-
tion itself was the fundamental instrument of government in
this State from July 2, 1776, to the adoption of the 1844
Constitution, and was submitted to by the legislative, execu-
tive and judicial departments of the government, and also
by the people of this State, as having the force of a constitu-
tion. *Bott v. Secretary of State*, 62 *N. J. L.* 107, 118 (*Sup.
Ct.* 1898); *Jameson Constitutional Conventions*, § 104.

This is the historical fact of the matter, although I agree
with the majority that the 1776 Constitution was deemed by
its framers to be "a statute, albeit an important statute, of

the type of Magna Carta, but nevertheless a statute amendable by any Legislature created under it."

Besides Article XXIII, the Constitution of 1776, contained the following language:

"Provided always, and it is the true intent and meaning of this congress, that if a reconciliation between Great Britain and these colonies should take place, and the latter be again taken under the protection and government of the crown of Great Britain, this charter shall be null and void, otherwise to remain firm and inviolable."

At this late date I do not think it necessary to deal with the abstract question as to where the sovereignty rested in those embattled moments in our history. The Revolutionary government of the new nation and of this State consisted of the Continental Congress, the Articles of Confederation and our own Revolutionary Constitution of 1776.

I have noted that the Constitution of 1776 and particularly Article XXIII contains no oath of allegiance as such. The oath set out therein is an oath of office rather than an oath of allegiance.

On September 19, 1776, the Legislature enacted *P. L.* 1776, *c.* 2 which required that all officers, both civil and military, then in office or thereafter appointed should take the following oath:

"I, A B, do sincerely profess and swear, (or, if one of the people called Quakers, affirm) that I do not hold myself bound to bear allegiance to the King of Great Britain. So help me God.

"I, A B, do sincerely profess and swear, (or, if one of the people called Quakers, affirm) that I do and will bear true Faith and Allegiance to the Government established in this State under the Authority of the People. So help me God."

This was the single oath of allegiance required during the revolutionary period prior to the adoption of the Constitution of the United States.

The Constitution of the United States was adopted in 1787 and ratified in 1790, and established in the United States a representative republican form of government and guaranteed, by Article IV, section 4, this type of government to each of the several states and further guaranteed to protect

each of them against invasion on the application of the legislature, or of the executive (when the legislature cannot be convened) against domestic violence.

In Article VI, paragraph 3 of the United States Constitution it is provided:

"The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any office or public Trust under the United States."

This is a clear mandatory direction that the officers mentioned therein, whether they are federal or state officers, are required to take a formal oath of allegiance to support the Constitution of the United States. The provision does not set forth the form of the oath nor does it attempt to state whether the oath shall be a constitutional oath in each state or as may be provided by statute. The decision in these matters is left to the Congress and to the several states.

From the very first statute enacted by the Congress of the United States down to the present moment the Congress has implemented this provision of the Constitution by statute.

On June 1, 1789, the Congress of the United States as Statute 1, Chapter 1, enacted the following oaths of allegiance:

"Sec. 1. Be It enacted by the Senate and (House of) Representatives of the United States of America in Congress assembled, That the oath or affirmation required by the sixth article of the Constitution of the United States, shall be administered in the form folllowing, to wit: 'I, A B do solemnly swear or affirm (as the case may be) that I will support the Constitution of the United States.' "

"Sec. 3. And be it further enacted, That the members of the several State legislatures, at the next sessions of the said legislatures, respectively, and all executive and judicial officers of the several states, who have been heretofore chosen or appointed, or who shall be chosen or appointed before the first day of August next, and who shall then be in office, shall, within one month thereafter, take the same oath or affirmation, except where they shall have taken it before; which may be administered by any person authorized by the law of the State, in which such office shall be holden, to administer oaths."

1 *Statute at Large, p.* 23.

This oath was a required oath from 1789 until 1862 when the Congress of the United States enacted the following oath applicable to officers elected or appointed under the Federal Constitution.   Laws of 1862, Chapter 128:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That hereafter every person elected or appointed to any office of honor or profit under the government of the United States, either in the civil, military or naval departments of the public service, excepting the President of the United States, shall, before entering upon the duties of such office, and before being entitled to any of the salary or other emoluments thereof, take and subscribe the following oath or affirmation: 'I, A B, do solemnly swear (or affirm) that I have never voluntarily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance, counsel, or encouragement to persons engaged in armed hostility thereto; that I have neither sought nor accepted nor attempted to exercise the functions of any office whatever, under any authority or pretended authority in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power or constitution within the United States, hostile or inimical thereto. And I do further swear (or affirm) that, to the best of my knowledge and ability, I will support and defend the Constitution of the United States, against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion, and that I will well and faithfully discharge the duties of the office on which I am about to enter, so help me God;' which said oath, so taken and signed, shall be preserved among the files of the court, House of Congress, or Department to which the said office may appertain.   And any person who shall falsely take the said oath shall be guilty of perjury, and on conviction, in addition to the penalties now prescribed for that offence, shall be deprived of his office and rendered incapable forever after of holding any office or place under the United States.   Approved July 2, 1862."   12 *Statutes at Large*, *p.* 502, (*Revised Statutes* 1873-74, *p.* 313).

It is indisputable that this latter oath was a test oath of allegiance to the government and the sovereignty of the United States.   Oaths similar in form have been referred to as such in all opinions where the problem is discussed.

In 1867, a similar test oath required by the Constitution of the State of Missouri was attacked and held unconstitutional in *Cummings v. Missouri,* 4 *Wall.* 277, 18 *L. Ed.* 356, on the ground that the test oath was both a bill of attainder

and an *ex post facto* law and violated Article I, Section 10 of the United States Constitution relating to limitation on state powers. The very same day the Supreme Court on the same grounds held that an act of Congress enacted January 24, 1865, requiring attorneys and counselors to take the federal test oath above set out was unconstitutional under Article I, Section 9, applicable to congressional power. *In re Garland,* 4 *Wall.* 333, 18 *L. Ed.* 366. The holding in both cases was that a legislative act which inflicts punishment for past conduct, without judicial trial, was a bill of attainder and *ex post facto* within the meaning of the term as used in Article I, Sections 9 and 10 of the United States Constitution.

Those were bitter times and feelings were running high but nowhere in these opinions, or in the arguments in these cases, was it suggested that the enactment of the oath was a violation of Article VI, paragraph 3 of the United States Constitution, which section applies to both the Federal Government and the states.

As a result of these two decisions and the ground on which they were based, Section 3 was included in the 14th Amendment to the Constitution of the United States, and this section in effect disqualified persons from office who refused to take this test oath in the form set out. Section 3 of the 14th Amendment provided as follows:

"No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability."

The 14th Amendment was ratified July 28, 1868. Anticipating the ratification of this Article the Congress on July 11, 1868, enacted Chapter 139, Laws of 1868 (15 *Statutes at Large, page* 85), which provided as follows:

"That whenever any person who has participated in the late rebellion, and from whom all legal disabilities arising therefrom have been removed by act of Congress by a vote of two thirds of each house, has been or shall be elected or appointed to any office or place of trust in or under the government of the United States, he shall, before entering upon the duties thereof, instead of the oath prescribed by the act of July two, eighteen hundred and sixty-two, take and subscribe the following oath or affirmation: I, A. B., do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."

The next step by Congress was taken when it enacted Chapter 53, Laws of 1871 (16 *Statutes at Large, page* 412) which provides as follows:

"That when any person who is not rendered ineligible to office by the provisions of the fourteenth amendment to the Constitution, shall be elected or appointed to any office of honor or trust under the government of the United States, and shall not be able on account of his participation in the late rebellion to take the oath prescribed in the act of Congress approved July two, eighteen hundred and sixty-two, said person shall, in lieu of said oath; before entering upon the duties of said office, take and subscribe the oath prescribed in an act of Congress entitled 'An act prescribing an oath of office to be taken by persons from whom legal disabilities shall have been removed,' approved July eleven, eighteen hundred and sixty-eight."

Congress did not again deal with this subject until 1884 when it enacted Chapter 46, Laws of 1884 (23 *Statutes at Large, page* 22), which is the oath required by all federal officers today. 5 *U. S. C. A., Section* 16, *page* 20:

"The oath to be taken by any person elected or appointed to any office of honor or profit either in the civil, military, or naval service, except the President of the United States shall be as follows: 'I, A B, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God.' This section shall not affect the oaths prescribed by existing statutes in relation to the performance of duties in special or par-

ticular subordinate offices and employments. The provisions of this section shall in no manner affect any right, duty, claim, obligation, or penalty existing or incurred on or before May 13, 1884; and all and every such right, duty, claim, obligation, and penalty shall be heard, tried and determined, and effect shall be given thereto, in the same manner as if this section had not been passed."

The form of oath prescribed by this act was intended to relieve those to whom it related from the necessity of taking the oath required by the Act of 1862, commonly known as the Test Oath, and in lieu thereof to require the modified oath prescribed. 13 *O. P. Attorney General* 390.

In 1898 by Chapter 389, Laws of 1898, the Congress by a two-thirds vote removed all disabilities created by Section 3 of the 14th Amendment and the implementing statutes. 5 *U. S. C. A., section* 15.

I have set forth these various statutory oaths of allegiance enacted by the Congress pursuant to Article VI of the Constitution because it seems to conclusively demonstrate that the constitutional provision requiring that all officers designated therein "shall be bound by an oath or affirmation to support this constitution * * *" has never been considered as self-executing and that the Congress by law has prescribed the precise form of oath to be used and on occasion it has gone beyond the simple phrase "to support this constitution." The construction placed on this provision since Statute I, Chapter 1, Laws of 1789 down to date is that the Congress has and did exercise the power to implement this provision both as to the form and the contents of the oath of allegiance referred to in the Constitution. The provision has never been construed as self-executing, which obviously it is not. In the causes where the oaths were challenged they were not challenged but under Article VI, under other provisions of the Constitution which protect the rights of the individual citizen.

On the other hand the oath of office of the President of the United States is set out in Article II, Section 1 in the following form and language:

"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States; and will to the best

of my ability, preserve, protect and defend the Constitution of the United States."

Obviously this is a self-executing and complete provision. To date the Congress has never passed a single act or provision adding or detracting from the oath of the President, which is indicative of a basic distinction between these two separate and distinct provisions. A constitutional provision in the form of the presidential oath or the legislative oath (*Art. IV, sec. VIII, par.* 1) provided in our Constitution is a binding self-executing provision, free from encroachment by the Legislature. Allegiance Cases, *supra*.

My conclusion in this respect is further buttressed by the following fact. The oath to support the Constitution of the United States required of all state officers, to swear to support the Constitution of the United States as prescribed by Statute I, Chapter 1, Section 1, Laws of 1789, has remained unchanged down to date, though often re-enacted. *Rev.* 1878, *Secs.* 1836, 1837, *page* 324; 61 *Statutes at Large, Act July* 30, 1947, *Secs.* 101, 102, *page* 642; 4 *U. S. C. A.,* §§ 101, 102.

I return now to the oaths of allegiance in this State. The Legislature of this State by *P. L.* 1799 (Paterson's Laws 376, Sections 1 and 2), enacted February 20, 1799, required that every person who is or shall be required by law to give the assurance of fidelity and attachment to the government of this State shall take the following oath:

"I. I            do sincerely profess and swear, that I do and will bear true faith and allegiance to the government established in this state, under the authority of the people. So help me God.

"II. And be it enacted, That the governor for the time being, of this state, and every person who shall be appointed or elected to any office, legislative, executive, or judicial, under the authority of this state, or to any office in the militia thereof, and every counsellor, solicitor and attorney at law, shall, before he enters upon the execution of his trust, office, or duty, take and subscribe the foregoing oath of allegiance."

"XIX. That if any grand or petit juror, who hath not already taken and subscribed the oath of allegiance to this state, shall refuse, if required by the court, to take and subscribe the oath of allegiance prescribed by this act, in any court, to which he shall be summoned,

he shall, for every such offence, be fined by the said court, in any sum not less than eight nor more than thirty dollars; and the clerk of the said court shall deliver a certified list of the name of the juror and the fine awarded to the sheriff of the county, who shall thereupon levy and make the same, by distress and sale of such juror's goods, with costs.

"XX. That if any schoolmaster or usher shall neglect or refuse to take and subscribe the said oath of allegiance, for the space of one month after he enters upon the duties of his profession, he shall, for every week after the expiration of the said month, that he continues to keep school or teach as an usher, until he shall take and subscribe the said oath, forfeit four dollars, to be recovered by action of debt, with costs, by any person, who will sue for the same.

"XXI. That if any person, who shall be elected to any office by the council and assembly in joint-meeting, shall neglect or refuse to qualify into such office, for and during the space of two months, after being informed of his election by any member of the council or assembly for the county in which he resides, or by the clerk of the court of common pleas of such county, his said election shall thenceforth be void."

This oath was similar in form and substance to the 1776 oath and the federal oath, and these were the only oaths of allegiance required by the law in this State down to the adoption of the Constitution of 1844.

The opinion of the majority makes certain references to the debates which occurred in that convention and I therefore have made some examination of these authorities, although for reasons hereinafter stated I do not deem them to be controlling.

In the Convention of 1844 the Committee on the Legislative Department did not include an oath of allegiance or an oath of office for members of the Legislature in its report. *Journal of the Convention,* page 50. But the proposed oath referred to in the majority opinion was included in the report of the Committee on Subjects not Referred to Other Committees and is found in paragraph 7 thereof. *Journal of the Convention,* page 83. There is no reference in the official journal to the debate quoted in the majority opinion. The remarks quoted are taken from an unofficial compilation made under a federal works project which was compiled from various newspaper reports of the day of convention activities. Even if these were official reports the rule of construction is that the

intention must be spelled out from the language of the Constitution itself and we cannot go to journals and debates nor to one's memory to determine this intention. *In re Hudson County,* 106 *N. J. L.* 62, *p.* 73 (*E. & A.* 1928) ; *Flagg v. Johansen,* 124 *N. J. L.* 456 (*Sup. Ct.* 1940).

Considering for a moment the oath as proposed : It was required to be taken by "members of the legislature, and all officers commissioned by the authority of the state * * *." After discussion Mr. Jaques moved to strike out "and all officers commissioned by the state." This motion was agreed to. *Proceedings of the Constitutional Convention of 1844,* page 394. See *Journal of the Convention,* page 209, section 32 of the legislative article, and page 227 for the adoption of this section without further amendment other than the Jaques' amendment.

The single oath of allegiance, therefore, in the Constitution of 1844 is in the form of oath prescribed in Article IV, Section 8, paragraph 1, which is a combined oath of allegiance and office for members of the Legislature :

"I do solemnly swear (or affirm, as the case may be), that I will support the constitution of the United States and the constitution of the State of New Jersey, and that I will faithfully discharge the duties of senator (or member of the general assembly, as the case may be), according to the best of my ability."

There was no constitutional oath of allegiance or office in that Constitution for the Governor or any other officers commissioned by the State. In 1875 the Constitution was amended and Article IV, Section 8, paragraph 2 was adopted September 7, 1875, and this contains an oath of office for officers of the Legislature.

These two provisions are self-executing and mandatory and were incorporated in the Constitution of 1947 without change in Article IV, Section 8, paragraphs 1 and 2. These are constitutionally prescribed oaths which cannot be enlarged or altered and are free from encroachment by the Legislature.

All our Constitutions, 1776, 1844 and 1947, have contained the legislative oath of office in full, but only the latter two have contained an oath of allegiance. The reason, probably,

was that the convention thought it would be anomalous to permit the Legislature to prescribe its own oath of office. This is just a suggestion, but the fact remains that the power to prescribe the oath of allegiance and the various oaths of office for all other officers commissioned by the State, executive, judicial and military, was left to the Legislature subject to the restraints and limitations of both the Federal and State Constitutions.

The Legislature of 1846, composed to a considerable extent of the same citizens who were delegates of the 1844 convention, by P. L. 1846, Chapter 25 re-enacted practically all the oaths and sections of Paterson's Laws, page 376, except the section relating to school teachers which was replaced by a section applicable to justices of the peace. It continued the provision that if a member of the Legislature neglected or failed to qualify for such office within two months his right to the office was null and void.

It is hornbook law that to qualify and accept an office, an elective or appointive officer must take the prescribed oaths of allegiance and office. It is because of this principle that it is proper to include a reference to members of the Legislature in such a statute and such reference neither adds nor detracts from the constitutional oath.

These various penalty sections have been continued in the statutes down to the present. *Nixon's Digest* 1846, *page* 627, *sections* 19, 20 and 21; *Rev.* 1877, *page* 903; 2 *General Statutes* 2331, 2332 (1895), 3 *C. S.* 3771; *R. S.* 2:85–4; *R. S.* 52:14–9; *R. S.* 2:9–7.

By *P. L.* 1920, *Chapter* 215, 2 *Cum. Sup.* 142–41, a further oath of allegiance was enacted in the language of the constitutional oath for members of the Legislature, and this oath was "in addition to any official oath that may be specifically prescribed" and it applied to "every person hereafter elected or appointed to any public office in the state or in any county or municipality."

While there may be a redundance in language in comparison with Paterson's oath of allegiance, this 1920 act did certain things: (1) it required for the first time an oath of

allegiance by county and municipal officers; (2) it set forth a specific statutory oath of allegiance to the Constitution of the United States in conformity with Article VI of the Federal Constitution and the Federal statutes above enumerated. These various oaths of allegiance. are now found in *R. S.* 41:1-1 and 41:1-3.

The Constitution of 1947, Article VII, Section 1, provides:

"Every State officer, before entering upon the duties of his office, · shall take and subscribe an oath or affirmation to support the Constitution of this State and of the United States and to perform the duties of his office faithfully, impartially and justly to the best of his ability."

The conclusion of the majority opinion is that this section contains an exclusive oath of allegiance. A comparison of this section with Article IV, Section 8, paragraph 1 of the same Constitution does not support this position. The convention, if it so desired, could have incorporated the legislative oath of allegiance in identical terms and language in Article VII, Section 1, and I could then agree with the majority, but this they did not do. I find nothing in the quoted excerpts from the record of the constitutional convention (1947) which remotely suggests such an intention. The estimable lady quoted in the majority opinion was not a delegate but merely expressed the thought that every *appointive* state officer should take an oath to support both constitutions. That is exactly what all state officers have been doing since 1789 and they were required to take these statutory oaths in order to qualify and accept the office.

As I read the language of this section it is similar in form and language to the comparable provision in Article VI of the United States Constitution, and I think I have demonstrated exhaustively that under that section Congress has consistently prescribed the form of, and in some instances enlarged, the oath of allegiance beyond the general wording of that provision. Such has been the contemporaneous construction placed on that provision by the Congress and the courts since 1789, and it is idle to suggest that in the bitter Civil War period and the reconstruction days that such an

exercise of power would not have been challenged if it had been considered outside the powers of the Congress under this provision.

Contemporaneous construction of a constitutional provision which has been continued and followed since the founding of our government as a matter of practice is entitled to great weight where the words may be of doubtful signification. *Cohen v. Virginia, supra; Martin v. Hunter, supra; Cooley v. Board of Wardens, etc.,* 12 *How.* 299, 13 *L. Ed.* 996; *Maynard v. Hill,* 125 *U. S.* 190, 31 *L. Ed.* 654, 8 *S. Ct.* 723; *State v. Kelsey,* 44 *N. J. L.* 1 (*Sup. Ct.* 1882); *Morris v. Wrightson,* 56 *N. J. L.* 126 (*Sup. Ct.* 1893); *In re Hudson County,* 106 *N. J. L.* 62 (*E. & A.* 1928); *Burlington County v. Martin,* 129 *N. J. L.* 92 (*E. & A.* 1942).

This principle is subject to the further rule that when a later constitution adopts a provision of an earlier one that has received a certain construction, contemporaneous or judicial, this provision is deemed to be adopted as thus construed, *State v. De Lorenzo,* 81 *N. J. L.* 613, *p.* 623 (*E. & A.* 1911). Such rule was applied in *State v. Rogers,* 56 *N. J. L.* 480, *p.* 621 (*Sup. Ct.* 1894), by Chief Justice Beasley in construing Article IV, Section 2, paragraph 1, Constitution (1844), which was and is a copy of a clause of the same import in the Constitution of the United States.

Therefore, since Article VIII, Section 1, Constitution 1947 is a counterpart and of the same import as the third sentence of Article VI of the United States Constitution, I am forced to the conclusion that, except as to members of the Legislature, the Legislature of this State may pass implementing statutes prescribing oaths of allegiance for all officers having as its minimum requirements support of the United States Constitution and the Constitution of this State. It is in this sense that I understand the dictum of Chief Justice Marshall in *McCulloch v. Maryland,* 4 *Wheat.* 316, 416, 4 *L. Ed.* 579.

As I said at the outset, an oath to support and defend the constitution is actually more comprehensive than a mere oath of allegiance to the government established because it em-

braces a simple oath of allegiance, and more. It seems to me that the Legislature may define and particularize the obedience and duty required if it stays within the constitutional limitations of the Federal and State Constitutions, and particularly the bill of rights found in both and the prohibition against the test oath on religious grounds found in Article VI of the United States Constitution.

I can not conceive that anyone could think that the various religious test oaths referred to in the majority opinion and the opinion of the Appellate Division and in the briefs could be enacted in this country in view of our constitutional provisions. I am satisfied that the Legislature had the right to implement the provision of Article VII, Section 1, Constitution 1947.

The question in this case then is does the proposed oath contained in *P. L.* 1949, Chapter 21, violate such constitutional provisions.

"I,                do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of the State of New Jersey, and that I will bear true faith and allegiance to the same and to the Governments established in the United States and in this State, under the authority of the people; and will defend them against all enemies, foreign and domestic; *that I do not believe in, advocate or advise the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in the Government established in the United States or in this State; and that I am not a member of or affiliated with any organization, association, party, group or combination of persons, which approves, advocates, advises or practices the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in either of the Governments so established; and that I am not bound by any allegiance to any foreign prince, potentate, state or sovereignty whatever, So help me God.*"

The majority applies the maxim *expressio unius, exclusio alterius* to the resolution of the problem here presented. It is applied to the sections of our Constitution relating to the qualifications of constitutional officers, viz., the Governor, members of the Senate and General Assembly, etc., Article V, Section 2; Article IV, Section 2. On the authority of the cases of *Johnson v. State,* 59 *N. J. L.* 271· (*Sup. Ct.* 1896);

affirmed, *Ibid.,* 535, and *State v. Carrigan,* 82 *N. J. L..*225 (*Sup. Ct.* 1912), it is held that these qualifications cannot be added to or changed by law. This I concede, but I do not consider the cases applicable for several reasons.

While the maxim quoted has been applied in a few instances to the interpretation of constitutions; 2 *Sutherland Statutory Construction* (3rd *Ed.*), § 4916, yet the maxim is one which should be applied with caution, *Ibid.,* § 4917. This is true *a fortiori* in applying it to a constitution. *Jameson, Constitutional Conventions,* § 572 *et seq.* Its application to the Constitution (1844) was argued at some length in *Borg v. State Board of Canvassers,* 131 *N. J. L.* 105 (*Sup. Ct.* 1944), although the decision in that case turned on another ground. If it were applied in that case with the same effect as here, it would have been impossible to have held the Convention of 1947.

I did not question then and I do not question now the right of the people to assemble in such convention to change or alter the fundamental law of the State, but I merely point out these facts to emphasize the caution with which this maxim of statutory construction should be applied to a constitution. A constitution necessarily deals with many diverse subjects and objects, some connected with and others totally unrelated one to another, whereas a statute usually deals with a single object or subject matter.

These provisions in these sections relate to the qualification of a citizen necessary for eligibility to the designated office. The provisions here being considered related to the oath of office and oath of allegiance which are prerequisites for the qualification and acceptance of the office, and they are the necessary formalities or conditions which must be complied with before a person is entitled to full investiture in office. 46 *C. J.* 960.

Our Constitution does provide that all qualified voters who possess these qualifications may be candidates for and be elected to office if they meet these conditions of eligibility, and these sections contain definitions of personal characteristics and qualifications of the persons who may hold office.

Under such circumstances, such qualifications must be held to mean the equivalent of eligibility. In fact, the very word "eligible" is used in the last sentence of Article IV, Section 1, paragraph 2, which defines the qualifications for membership in the Senate and Assembly. *Cf. Board of Com'rs of Guadalupe County v. District Court of Fourth Judicial District,* 29 *N. M.* 244, 223 *Pac.* 516, 522.

These provisions as to the oaths are separate and distinct from the provisions relating to personal qualification, to the same degree as the provision relating to the issuance of a commission differs from that relating to the powers of appointment or the method of election and can scarcely be considered as one and the same; since the power to perform under them is given in two separate and distinct articles and sections of the Constitution. *Marbury v. Madison,* 1 *Cranch.* 137, 2 *L. Ed.* 60.

Despite those sections on qualifications it has been held that even though a person is personally possessed of all the personal constitutional or statutory qualifications, it is necessary before he becomes a *de jure* officer that he must take any oath required by constitution or statute for that particular office. *Manahan v. Watts,* 64 *N. J. L.* 465, 473 (*Sup. Ct.* 1900); *Murphy v. Freeholders of Hudson,* 91 *N. J. L.* 40, 42 (*Sup. Ct.* 1918).

For these reasons I am of the opinion that the *Johnson* and *Carrigan cases* and other cases of similar import are without application to the questions here presented.

Now as to *P. L.* 1949, Chapter 21 itself, I want to make myself clear. I believe that every citizen has the right to believe in, advocate, advise or approve any change in the government of the United States or of this State by constitutional means, but this does not include advocation of the use of force and violence. However, this right is subject to the guaranty of the republican form of government given by Article IV, Section 4 of the United States Constitution. If such a change were effected and the republican form of government abandoned in this State, the determination whether such change in the government violated this guaranty is a political and

not a justiciable question. *Luther v. Borden, 7 How.* 1, 12 *L. Ed.* 581; *Pacific Coast Tel. & Tel. Co. v. Oregon, 223 U. S.* 118, 56 *L. Ed.* 377, 32 *Sup. Cl.* 224.

This right is guaranteed to each citizen by Amendments I and XXIV of the United States Constitution and Article I, paragraph 2 of our Constitution. I shall note here that this article of our Constitution as originally presented to the convention of 1844 read "to alter or reform the same, *and to abolish one form of government and establish another."* These italicized words were struck from the proposed provision by amendment.

Another proposed amendment to the effect that man gave up none of his rights on entering society, etc., was defeated. The convention by so doing confirmed its adherence to the constitutional republican form of government and the restrictions of the right of a citizen to seek, alter and change such form of government within the framework of the Constitution of this State and the Constitution of the United States. *Journal of Convention,* pages 43, 46, 63, 88, 89.

The key words in the proposed statutory oath are "the use of force or violence or other unlawful or unconstitutional means." The oath as proposed does not refer to past acts or beliefs; it speaks *in præsenli.* The provision directs an inquiry to what "mental reservation or purpose of evasion" (see federal oath) may exist in the mind of the officer in the direction indicated by the words quoted. It is implicit in the present oaths of allegiance, both constitutional and statutory, though not expressed therein, that when a person swears to support and defend the constitutions that he means he will actively resist by lawful means available to government any attempt by the use of force or violence or other unlawful or unconstitutional means to overthrow or change the government.

I suggest that the reader make a leisurely perusal of the italicized matter in the proposed oath and determine for himself whether anything is there which is not inherent in the expression "truth faith and allegiance to the government established in this state" or with "support"—if that word is used in its just significance—of the Constitution. I think there is

not. You cannot hold with the hounds and run with the hares at the same time.

An attempt to overthrow the government by force or violence is a revolution for it is a political act done in violation of law. It rests, as I have said, for its warrant on force and power hostile to established government. It is a violation of law which includes the constitution, the statutes, and the letter and necessary implications of both.

Our government having been established it has the power to protect itself and its members, including the citizens, from the operations of harmful and disloyal persons either outside or inside the government, provided this power is exercised within constitutional limitations. Where can it create or impose the duty of day to day obedience to it by those who live under it or hold office under it, except in an oath of allegiance commanding it to be discharged? This is the all-inclusive duty correlative to each and every right we enjoy, exercise and are guaranteed under our form of government.

Our Constitution specifically defines the crime of treason with particularity, in counter-distinction to the indefinite and uncertain nature of the common law crime. This is but a facade of the breach of an oath of allegiance.

Another phase is dealt with by our statutes relating to sedition, involving as it does the public advocacy by word or act of the overthrow of the government by force. *R. S.* 2:173–12 to 21. These and similar statutes have been held constitutional. *State v. Tachin,* 92 *N. J. L.* 269 (*Sup. Ct.* 1919); affirmed, 93 *N. J. L.* 485, error dismissed, 254 *U. S.* 662, 65 *L. Ed.* 463, 41 *Sup. Ct.* 61; *Gitlow v. New York,* 268 *U. S.* 652, 665, 69 *L. Ed.* 1138, 45 *Sup. Ct.* 625. *Cf. State v. Gabriel,* 95 *N. J. L.* 337 (*Sup. Ct.* 1921). These statutes define crimes and therefore the nature of the crime must be set forth with particularity. Amendment VI, U. S. Constitution and Article I, paragraph 10, Constitution (1947), and such acts present a clear and present danger to the public welfare, and the government itself.

If such acts can create a clear and present danger to the public welfare, how can the government defend itself if its

officers "believe in, advocate or advise the use of force and violence, or other unlawful or unconstitutional means to overthrow or change the government?" To ask the question is to answer it. Must the defense of the government be left to a part of the people, in their individual capacity, acting in dissociated and non-organized groups? If so, the defense and support of the government may solely rest on the law of the vigilante. Under the technique for revolution today, even this latter possibility might be illusory, futile and impossible.

A person cannot truly swear and affirm an oath to support the Constitution of the United States and this State and believe in its overthrow by force or violence, without doing so with a mental reservation or a purpose of evasion. It is a principle of our constitutions that a change in the organization of our government is to be effected by the orderly procedures ordained by the constitutions and not by force or fraud. Dissenting opinion, Chief Justice Stone, *Schneiderman v. United States,* 320 *U. S.* 118, 181, 87 *L. Ed.* 1796, 63 *Sup. Ct.* 1333. Nothing in the majority opinion or the subject matter of that case is contrary to or inconsistent with what I have said here.

It is urged that the statute here considered is a bill of attainder. As I said, this statute is *in præsenti* and promissory in nature. *Cummings v. Missouri, supra,* and *In re Garland, supra,* dealt with acts which had been committed in the past. Reliance is also placed on the case of *United States v. Lovett,* 328 *U. S.* 303, 90 *L. Ed.* 1252, 66 *Sup. Ct.* 1073. In that case the statute was indefinite and unclear and could be read so that it applied not only to past acts but present intentions and therefore the statements of the majority opinion as to it being a bill of attainder, should be read in the light of the possible construction of the statute as to past acts, and this is made clear in the concurring opinion of Mr. Justice Frankfurter.

If, because a person cannot take the proposed oath in good faith, he is disqualified from office, it is because he admittedly cannot and does not intend to carry out the oath to support and defend the Constitution. I cannot say that such a requirement amounts to a bill of attainder.

For the reasons stated before, I find nothing in the statute that invades the constitutional rights of individual citizens of freedom of thought, expression and speech in *contra*-distinction to the duty of a sworn officer and employee of the government. There is not a single semblance of a trespass on religious freedom, for I do not understand that any Catholic or Jew or other denomination owes any duty of allegiance to another sovereignty in the sense that I use the term. Nor do I understand that any foreign citizen who bears a normal attachment of kind memories to his native land might be embarrassed by taking this oath. The answer to that is that such a citizen took a similar oath when he became naturalized. 8 *U. S. C. A., Secs.* 137 and 735.

It is argued that the naturalization statute has for its very purpose exclusion of non-desirable aliens. As to the statute this is true, but here again is the distinction between personal characteristics and acceptance of an office or duty. By taking the oath of allegiance the alien candidate accepts and assumes his duty of citizenship of the United States.

In a certain sense all citizens are naturalized citizens. What is the Constitution of the United States but the most authoritative, important and solemn act of naturalization that has ever been known? By adopting the Constitution of the United States did not the states and the people declare that every citizen of each state becomes, by virtue of that act, a naturalized citizen of every other state as a separate community, and of all as one nation?

It is next urged that the real objective of the oath is found in the words "other unlawful or unconstitutional means," and that all doctrines disagreeable to those in office can be outlawed as leading to "illegal change." As I said, the key words are "force and violence" and the word "unlawful" is synonymous with "unconstitutional" and means in violation of constitutional limitations. No one has pointed to a single constitutional provision or statute in this country or in any free country, that authorizes a change in government to be accomplished by force or violence. I do not deny that a person may advocate a change in government by means or steps not au-

thorized by the Constitution, but in so doing he may not breach the Constitution and advocate or advise that such a change shall be made by force, violence or fraud. Then he violates his allegiance as a citizen and the government and its officers owe a duty to all the other citizens to protect their rights and privileges and their government against those who would overthrow the government by force and with it their precious rights and privileges.

It is next urged that the words "I am not a member of or affiliated with any organization, party, etc.," charge guilt by association. The first answer is that this is not a crimes act, and a violation of it is not a crime. *Cf. State v. Dayton,* 23 *N. J. L.* 49 (*Sup. Ct.* 1850) ; 1 *Hawkins Pleas, c.* 69, § 3. The second answer is that a person who is a member of such association, etc., who has no knowledge of its unconstitutional and unlawful purpose, can truly swear and affirm true faith to our government—which is all this oath asks. Does he know of or believe in such unlawful purpose?

Of course, no provision, constitutional or statutory, can prevent an *unmoral* person from falsely swearing to such oath in the hope that at an opportune moment, he may, with personal impunity, be able to aid and assist in the overthrow of the government by force. An *unmoral* person is what he is because he lacks the physical courage of his convictions.

I understand the word "affiliated" as used in the statute to mean more than merely in sympathy with its aims or even willing to aid it in a casual intermittent way. Affiliation includes an element of dependability upon which the organization can rely which, though not equivalent to membership duty, does rest upon a course of conduct that could not be abruptly ended without giving at least reasonable cause for the charge of a breach of good faith. But on the other hand he who cooperates with such an organization only in its lawful activities cannot by that be said as a matter of law to be "affiliated" with it. *Bridges v. Wixon,* 326 *U. S.* 135, 142, 143, 89 *L. Ed.* 2103, 65 *Sup. Ct.* 1443. Of course, once he discovers or is aware of its unlawful purpose a good citizen is under a duty to disaffiliate himself from such a movement.

As I have said, a good citizen cannot hold with the hounds and run with hares at the same time.

But he who cooperates with such organization only in its wholly lawful activities cannot by that fact be said as a matter of law to be "affiliated" with it. Affiliation must be of that quality which indicates a belief in adherence to the furtherance of the unlawful purpose of the overthrow of the established government in this State by force or violence. The word as used in the statute is used in the sense that there is knowledge or a wilful intent to cooperate even in such unlawful purpose. *A fortiori,* this same reasoning applies to the word "member."

The language of the statute as so construed is not indefinite when read in the light of its purpose to assure that the officers of our government shall be completely loyal to its spirit and its purpose. It is not a crimes statute and the question of due process does not arise.

We have had an outstanding example in the labor movement in the last few months, when thousands of members discovered that their organizations were controlled by people who advocated the overthrow of the government by force. They had the physical courage and a sense of obedience to the government that impelled them to withdraw from these organizations and establish their own organization to accomplish the purposes for which they originally joined such organizations. This was at great sacrifice to themselves, but their loyalty to the government was greater than their loyalty to an individual organization.

In *Gitlow v. New York, supra,* it was held that the advocacy of the overthrow of the government by force presented a sufficient danger of a substantial evil to bring its suppression within the legislative power, since the state had the power to defend itself against acts or utterances which imperil its own existence as a constitutional state. In that case "advocacy" was defined as "the act of pleading for, supporting or recommending; active espousal." It is in this sense that I understand the use of the word "advocate" in the statute here under consideration, and I think I have made it quite clear in dis-

cussing the meaning of the word "affiliated" that there is involved a belief or intent to achieve the furtherance of the unlawful purpose.

In this cause, the Appellate Division held "that Chapters 21 to 25 inclusive of the Laws of 1949 are invalid insofar as they relate to the Governor, Senators and Members of the General Assembly and candidates for those offices." The effect of this language was not to declare Chapter 23 unconstitutional because patently it did not come within the limitation so expressed.

The constitutionality of Chapter 23 of these laws was not argued before this court and as I understand the majority opinion, while it states that Chapters 21, 22, 24 and 25 are unconstitutional, it affirms the judgment of the Appellate Division and holds that these statutes are unconstitutional as they relate to the Governor, Senators and Members of the General Assembly and candidates for those offices, and they are unconstitutional as to all state officers who fall within the provisions of Article VII, Section 1, Constitution of 1947.

For the reasons above stated, I disagree. I have concluded that Chapters 21, 22 and 24 are constitutional and valid except insofar as they relate to the oath of allegiance and oath of office for members of the Senate and General Assembly.

I do not consider these excepted unconstitutional provisions so intimately connected with and dependent upon each other or the other provisions of these statutes to warrant that the belief that the Legislature intended only to enact them as a whole; nor can I say that if all could not be carried into effect then the Legislature would not have passed the residue independently. *Wilentz v. Galvin*, 125 *N. J. L.* 455, *p.* 458 (*Sup. Ct.* 1904).

I am quite sure that the principal purpose of the Legislature was to make these statutes applicable to the constitutional officers and employees of the State Government and of the counties and municipalities who are responsible for the execution and carrying out of our laws, which would also include the judicial branch.

As to the status of *P. L.* 1949, *c.* 23, this statute on its face does not come within the reasoning of the majority opinion nor of the conclusion reached by the Appellate Division, since it applies only to the regulating, licensing and employment of school teachers and amends *R. S.* 18:13–9.1 and *R. S.* 18:13–9.2 (*P. L.* 1935, *c.* 155) in which it set forth an oath of allegiance for teachers and supervisors in schools supported by public funds. This statute is undisturbed by the judgment of this court. I might observe at this time that I perceive no constitutional invalidity in this statute whatsoever and again point out that an oath of allegiance for teachers, school masters and supervisors is not new to this period of our history but was required by Paterson's Laws, page 376, section XX, a penal section of that statute above referred to.

I do not agree with the majority that *Chapter* 24, *P. L.* 1949, applicable as it is only to candidates for office, is unconstitutional. It requires that the oath of allegiance prescribed by *Chapter* 21, *P. L.* 1949, shall be taken by the candidates and attached to their petition and certificate of nomination. Chapter 24 does in effect require the candidate to make open profession of his allegiance to the government of this nation and state, within the meaning of the terms as I have defined them. It simply furnishes the means or method by which the voters may be informed as to the belief and understanding by the candidate of the duty of allegiance which each and every citizen owes to the government. I see nothing unconstitutional in such a requirement because it comes within the principle that a change in the organization of our government is to be effected by orderly procedures ordained by the Constitution and not by *force* or *fraud*. *Schneiderman v. United States, supra.*

Chapter 24 aims to prevent a fraud on the electorate and will have the effect of requiring open declarations of allegiance from candidates. I do not see how a person can in one breath assert his right of freedom of speech and in another breath refuse to openly submit to the electorate his own honest convictions on a question as important as the allegiance

due by him as a citizen to the government. No candidate should be afraid to test his opinion in the lawful jurisdiction on such matters in a republic—the people at the ballot box.

As to the provision of Chapter 24, Section 1, which declares the election of a candidate who has refused to take the oath of allegiance null and void, I perceive no infirmity in this provision. As I have pointed out, we have had such a provision for years where an officer refused to take the oath of allegiance and oath of office and, furthermore, there is an adequate review in the courts of any ruling declaring such an election null and void, provided by other sections of the election statutes, *R.' S.* 19:29–1 to 14, which meet all the requirements of due process.

As to *P. L.* 1949, *Chapter* 25, this statute only applied to the 1949 elections and has spent its force by virtue of its own limitations and by virtue ·of the fact that the right of review in the courts has likewise expired. Any question thereunder is therefore moot.

I concur in the result reached by the majority as to the oath of allegiance and office required of the members of the Senate and General Assembly and hold that the statute is unconstitutional as to those offices. I dissent from the conclusions that these statutes are unconstitutional as they apply to the candidates for the offices of Senator and Assemblyman, and I am of the opinion that Chapters 21, 22 and 24 are constitutional and valid in all other respects.

I am authorized by Mr. Justice Case to state that he concurs in the reasoning and conclusions expressed in this opinion.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING and ACKERSON—5.

*For reversal*—Justices CASE and OLIPHANT—2.