ALEXANDER E. O. MUNSELL *v.* JAMES L. HEN-
NEGAN, ET AL., BOARD OF SUPERVISORS OF ELECTIONS
OF BALTIMORE CITY

[No. 16, April Term, 1943.]

Decided April 29, 1943.

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, MELVIN, and ADAMS, JJ.

*Harold Buchman* for the appellant.

*Robert E. Clapp, Jr., Assistant Attorney General,* with whom was *William C. Walsh, Attorney General,* on the brief, for the appellees.

MARBURY, J., delivered the opinion of the Court.

Appellant and complainant below, a member of the Communist Party, seeks a declaratory decree invalidating and holding unconstitutional Chapter 635 of the Acts of 1941, which amends certain sections of the election laws.

His claim is based upon his allegations that he is a citizen, voter and taxpayer of the City of Baltimore, and

is a qualified and authorized candidate of the Communist Party for the office of city councilman. The Communist Party, by reason of the fact that none of its candidates for two years polled 1 per cent. of the vote cast at any election held during that time, cannot nominate its candidates by a convention or primary meeting or primary election. The only method provided for such nomination is by independent nomination petition. Such nomination is made by certificate signed by specified numbers of voters, such numbers depending upon the territory which is to vote for the office sought. The number for the City of Baltimore is 1,500. The requirements in such certificate to which the appellant objects, and which he claims are unconstitutional, are, first: The certificate must state that the persons signing the same intend to vote for the person nominated thereby; second, the receiving officials shall cause to be published in a newspaper of general circulation, the names of all the signers of any such petition; third, there shall accompany any nomination petition or certificate an additional fee equal to 25 cents for each name required to be published. The appellant alleges that he was ready to comply with all the provisions of the election law, except the payment of the additional filing fees, that he inquired of the appellees, who are the Supervisors of the Election of Baltimore City, whether they would accept his petition or certificate without these fees, and was advised that they would not. He did not, therefore, attempt to get a petition executed, but filed this proceeding asking for a declaratory decree and an order enjoining the appellees from enforcing the provisions complained of. The appellees demurred, the court below sustained the demurrer and dismissed the petition, whereupon this appeal.

There are two preliminary points raised by the appellees, which are, first, that a petition for a declaratory decree in a court of equity is not the proper proceeding to obtain the relief prayed, and second, that the time has expired within which any petition of nomination un-

der any theory could be filed for the election in which the appellant desires to become a candidate and, therefore, the question is moot. We prefer to pass these questions without deciding them, and to base our conclusions upon the substantive questions raised, which in the public interest, we think should be decided.

The contentions of the appellant are that the right of minority political parties to nominate candidates by petition is an essential part of the elective franchise, subject only to regulations of a reasonable nature, and that the restrictions imposed on minority parties by the Act of 1941 infringe the secrecy of the ballot, and impose an oppressive and arbitrary discrimination against such parties by requiring the names of the signers to be published, and the payment of additional fees for such publication.

Article 7 of the Declaration of Rights states: "That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose elections ought to be free and frequent, and every [male] citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage." Article I of the Constitution itself has to do with the elective franchise and Section I starts with the statement, "All elections shall be by ballot," and thereafter fixes certain qualifications for voters. Article III of the Constitution, dealing with the legislative department, by Section 49 provides: "The General Assembly shall have power to regulate by law, not inconsistent with this Constitution, all matters which relate to the Judges of Election, time, place and manner of holding elections in this State, and of making returns thereof." Until 1890 there was no public or official ballot used in elections. Private ballots were circulated by parties, bearing the names of their candidates and, generally, what were considered appropriate emblems designating the party. These ballots were handed in at windows at the various polling places, and were placed by

the election officers in ballot boxes from which they were later taken and counted. Under this system parties were free to nominate their candidates in any way they saw fit, and it was usual to do it, in the case of the larger parties, by unofficial primaries which sent delegates to conventions where the nominations were made. This system was productive of grave abuses, and offered too much opportunity for fraudulent voting, for filling the ballot boxes with ballots which had not been voted, for destroying those that were voted, and for otherwise thwarting the will of the electors. As a result Chapter 538 of the Acts of 1890 was passed, which for the first time introduced the official or public ballot to general elections within the State. This was commonly known as the Australian Ballot Law and Section 128, which with a number of other sections was added by it to Article 33 of the Code, read in part: "Hereafter all ballots to be used and cast in any election to be held in this State under the constitution and laws thereof * * * shall be printed and distributed at the public expense; the word election in this section shall embrace all votes upon questions submitted to the vote of the people, but not primary elections." It was provided by Section 129 that nominations could be made by primary elections or conventions by parties which polled at least 1 per cent. of the vote cast at the last general election. Section 131 provided for nomination by petition or "nomination paper" signed by registered voters, the required number varying according to the extent of the territory to vote for the office sought. This section is the forerunner of Sections 85 and 90 of Article 33.

The Act of 1890, Chapter 538, was immediately attacked in the courts. One of the points raised against it was that it was a local or special law, because it excepted nine counties from its provisions. This court in the notable case of *Lankford v. County Com'rs of Somerset County*, 73 Md. 105, 20 A. 1017, 1021, 22 A. 412, the opinion being delivered by Chief Judge Alvey, dis-

missed this contention, stating that Article III, Section 49 of the Constitution does not require that election laws should be uniform throughout the State, nor does the statement in the Bill of Rights that all elections must be equal require a uniform regulation. The court said: "The question of the wisdom or policy of such form of legislation is not for the court to determine, but simply whether the Act under consideration has constitutional validity, and as to that we are clearly of opinion it has." There was a dissenting opinion filed by Judge Robinson and concurred in by Judge Irving, in which it was held that the fact that the Act did not apply to all the voters in the State rendered it objectionable to the Constitution. Lapse of time and other cases have confirmed the view of the majority of the court.

Article 33, the election article of the Code, was repealed and re-enacted in its entirety by Chapter 202 of the Acts of 1896. By Section 38 of Article 33, as thus enacted, a provision was made similar to that contained in Section 131 above mentioned. At this time, there was first inserted the provision that the certificates must contain the additional statement that the persons signing the same intend to vote for the candidates to be nominated. Section 38 became Section 43 in the Code of 1912. This was amended by Chapter 751 of the Acts of 1914 and by Chapter 399 of the Acts of 1922, but neither of these amendments affect the issues in the present case. Section 43 is now Section 85 of Code, 1939, and this and Section 90 were amended by Chapter 635 of the Acts of 1941. By Section 90 there is inserted for the first time the provision for publication of the names of the signers and for the additional fee of 25 cents for each name.

There are three methods by which the names of candidates may be printed on the ballot at the general election. Political parties polling more than 10 per cent. of the vote cast at the last general election must nominate by means of a primary election. Article 33, Section 229. Parties polling more than 1 per cent. and less than

10 per cent. may nominate by conventions, or primary meetings, as distinguished from primary elections. Article 33, Section 83. Parties polling less than 1 per cent. have to nominate through a petition under Sections 85 and 90, *supra.* The right of the Legislature to so provide was decided in this court in the case of *Kenneweg v. Allegany County Com'rs,* 102 Md. 119, 62 A. 249, 250. In that case the court had before it a local law providing for the holding of primary elections in one county in the State by two leading political parties only. The court, speaking through Chief Judge McSherry said: "The power to legislate in regard to elections—primary or general—if unrestrained by the Constitution itself, is inherent in the General Assembly, and the provision just cited, instead of conferring the power, is a mandate to execute a power implicitly assumed to exist independently of the mandate. 'The General Assembly shall pass laws,' is a direction to bring into activity an antecedent and independent authority." One of the provisions in that primary election law, which was attacked, was that requiring each candidate to pay to the chairman of the committee of his party a fee, regulated for the different offices, such fees to be used to defray the expenses of the election. The court further said: "Primary contests necessarily require the expenditure of money for the purposes just indicated, and the money must be procured from some source. The requirement that the individuals who, through the primaries, seek to secure nomination, shall pay the expenses which the governing body of their party are compelled to incur for their benefit and in their behalf, is neither unreasonable nor unjust, and most certainly is not the super-addition of a property qualification for holding the offices to which they aspire." Another objection was that the Act applied only to two political parties, and the court, as to that, said: "The circumstance that the Act applies only to two of the political parties does not affect its validity. The General Assembly has the power to pass an Act regulating the

primaries of one party alone, if it sees fit; and if, for reasons satisfactory to the legislative branch of the government, it is desirable that only the numerically stronger parties should be brought under the provisions of a primary election law, which has to do merely with the selection of candidates to be voted for, and is in no way concerned with the elective franchise, it is not the province of the courts to declare the measure invalid simply because other political parties polling a few scattering votes are not included within the enactment."

The basic contention of the appellant is that the right to make independent nominations is as vital to free elections as the right to vote for one's choice. This last right has been discussed and upheld in a case involving the necessity of having a space on the ballot in which a voter may write the name of his choice. *Jackson v. Norris,* 173 Md. 579, 195 A. 576. The appellant's contention is supported by a number of cases in other jurisdictions, although it is denied in others. It will serve no good purpose to discuss the individual cases on this general proposition. The weight of authority, with which we agree, is that electors should have the fullest opportunity to vote for candidates of any political party, and while this right, in cases where the public furnishes the ballots, may be restricted by the dictates of common sense, and by considerations of convenience in the size of the ballots, and by considerations of excessive costs, such restrictions will not be upheld when they are destructive of freedom of choice by the voters. This view is well expressed in a New York case decided more than thirty years ago in which the question was the nomination of an independent candidate for member of the New York Assembly. The court in discussing the general proposition now being examined said: "The Legislature of this State in its wisdom decided some years ago to adopt an official ballot, to be printed at the public expense, upon which the voter indicates his preference by cross-marks placed opposite the names of those candi-

dates whose election he desires. In providing for such a ballot it was not only proper but necessary to prescribe the conditions which should entitle political parties and independent bodies of citizens to have the names of their nominees appear upon the ballot in print. It is argued that these conditions are wholly within the discretion of the Legislature and not subject to judicial review or control; but this proposition is subject to the qualification that no condition can be imposed which conflicts with the constitutional rights of electors, express or implied." *In re Terry,* 203 N. Y. 293, 96 N. E. 931, 932. That case was recently cited as authority in a *per curiam* opinion holding that a statute, providing for an election where only political parties can make nominations, is in violation of the New York Constitution. *Moore v. Walsh,* 286 N. Y. 552, 37 N. E. 2d 555.

These statements are indicative of the general trend of the decisions from Texas, Oregon, Illinois, Washington, North Dakota, California, Montana, Nevada, South Carolina, Tennessee, Wisconsin and Michigan referred to in the appellant's brief. The cases referred to have been examined, and found to cover a wide range of situations, none of which is precisely the same as that before us. As is usual, in some cases the courts have stressed the right of the political party to have its candidates on the ballot, while in other cases, the right of the Legislature to impose reasonable restrictions has been given greater weight. This has depended upon the nature of the case before the court. In the main, however, the cases agree on the general principles outlined above.

The question, therefore, remains whether any of the requirements placed upon the appellant are so unreasonable as to render the statute unconstitutional. The first of his objections is that the secrecy of the ballot is endangered by the requirement that the signers of the petition state that they intend to vote for the candidate. But this is no more than the statement of intention. Under the primary election law, every voter who desires

to vote in the primary of one of the parties permitted to hold primaries must declare his affiliation with that party. This is clearly a declaration of intention in the main, at least, to vote for the candidates of that party, yet it does not bind the voter to do so. It is a matter of common knowledge shown by a comparison of figures from those voting in the primaries and those voting for the nominees of the party in the election, that not all of the voters who participate in the primary vote for the nominees of their party at the election. That is a right which the voter has when he is in the voting booth. No one is entitled to know how he votes, but there is no reason why he cannot be required to declare his general intention, nor is there any prohibition against it. If that requirement is made in the primary election law of the members of the majority parties, there would seem to be no valid reason for objecting to its being required of the members of a minor party, who have to nominate by petition. In passing, it may be noted that this provision has been in the statute since 1896. The fact that it has not been challenged does not prevent it from being challenged now, but the absence of challenge raises a factual presumption that it has not worked any hardship or prevented any minority party from making its nominations.

The second objection may be coupled with the third. The requirement for the extra fees is based upon the requirement that the names should be published. Fees based upon the emoluments of the office sought have been held to create a discrimination. *Johnson v. Grand Forks County*, 16 N. D. 363, 113 N. W. 1071, and cases there cited. The reason for this decision does not apply where the fees are to be devoted to a definite purpose in connection with the nomination. The Legislature may reasonably require candidates to pay a fair proportion of the expenses of an election (*Kenneweg v. Allegany County Com'rs, supra*) and have almost always done so. Candidates in primaries of the major parties are required to

make cash deposits with the election officials. In the case of minor parties, where additional publication is required, it is not unreasonable to require the candidates of such parties to pay for such publication, and that is all that seems to have been done in this case.

This brings us to the question whether the publication of the names of the signers is a reasonable provision. It is strongly urged that this provision was passed in 1941 at a time when a Committee of the House of Representatives of the Congress of the United States had informed State officials that widespread fraud had been detected in a nominating petition of the party to which the appellant belongs. That feeling ran high, and that there were three convictions as the result of actions in connection with the petition. That the real purpose of the Act of 1941 was to bar the Communist Party from the ballot, and that the bill itself was the product of hysteria.

The mere fact that a bill was passed at a time when feeling ran high, if it did, and when the party of the appellant was in bad odor from the detected frauds in its petitions, is not sufficient ground for striking down an Act, unless the provisions of the Act itself contravene the constitutional guarantees. We do not find from the Act that it applies to the Communist Party alone. On the contrary, it applies to all parties, which poll less than 1 per cent. of the vote. Nor do we find that the Act has the necessary effect of barring the Communist Party from the ballot. If it is so unpopular to be a Communist or to belong to any other minus 1 per cent. party, that no one will sign if his name is to be published (which was in effect the argument made by appellant's counsel) that does not condemn the system. The system intends that people belonging to a very small minority of the voters can put names of candidates on the ballot, but it regulates that right by insuring, as far as possible, that only those who want such names on the ballot in order to vote for such candidates, ask for it, so that the ballot will not be uselessly incumbered.

The Act may prevent a number of thoughtless people from signing to put someone on the ballot, whom they have no intention of supporting, but for whom they sign because they are asked. That effect is not in violation of the rights of anyone.

As we have shown above, it is necessary for a voter in order to participate in the primary of a majority party to affiliate with that party when he registers. The names of all voters when they register in the counties are printed in handbill form and copies are posted in ten prominent places in their precincts. Article 33, Section 27. This is a publication of the intention of these prospective voters, to whose names are attached their affiliations and addresses. In view of the posting in the neighborhood where the voter lives, it is a more effective announcement of his party politics, than is the publication of the signers, in the case of the minus 1 per cent. parties. The procedure is not precisely the same, but the difference is in method only. Whatever was the motivating purpose of the Legislature in passing the Act of 1941, it can readily be construed as the means of preventing the very frauds which caused the prosecutions and the hysteria, if there was any. Publications of names would make any person circulating a petition, careful he did not write in names of people who did not sign. The payment of the small fee for each name would impose care not to obtain names which were not *bona fide,* and which would not serve any purpose. It may have been a wise precaution on the part of the Legislature. That is, in the first place, a question for the Legislature to determine. The courts have nothing to do with it except to say whether or not it violates any constitutional rights. We are unable to find that it does.

It is true that provisions not essential to a fair election are generally held to be directory only. This question was discussed in the case of *Soper v. Jones,* 171 Md. 643, 187 A. 833. In that case a voter sought to prevent a candidate's name from going upon the ballot, because

it was stated that there were defects in some names and residences and because of lack of proper affidavits. The court then had before it the law existing before the enactment of the Act of 1941. The provisions in the latter Act, with which we are concerned in this case, are apparently intended to insure the fairness of an election by preventing fraudulent nomination. We are unable to hold that the Supervisors of Election can, in their discretion, determine not to obey them. The Legislature has told them what is to be done. The fees are to be collected and the names are to be published. The question whether an election would be valid if these provisions were not enforced, and a candidate's name put on the ballot without compliance, is not before us. We are asked to say that the Supervisors of Election can disregard the instructions of a statute. This we cannot hold.

We find that the appellant has not been deprived of any of his constitutional rights by Chapter 635 of the Acts of 1941, that the latter is a valid exercise of the legislative power, which violates no constitutional rights, and is not within any prohibition of the fundamental law of the State. The action of the lower court, in sustaining the demurrer and dismissing the bill of complaint, will be affirmed.

*Decree, affirmed, with costs.*