SHUB ET AL. *v.* SIMPSON, SECRETARY OF STATE

[No. 105, October Term, 1950.]

*Decided, per curiam, October 12, 1950.*

*Opinion filed November 1, 1950.*

184

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*I. Duke Avnet* and *Harold Buchman,* with whom was *William H. Murphy* on the brief, for the appellants.

*J. Edgar Harvey, Deputy Attorney General,* with whom was *Hall Hammond, Attorney General,* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

Louis Shub, duly nominated candidate of the Progressive Party of Maryland for the office of governor, Sam Fox, duly nominated candidate of the same party for office of United States senator, Marshall Jones, duly nominated candidate of the said party for the office of representative in Congress for the Fourth Congressional District, and Thelma Gerende, duly nominated candidate of the said party for the office of representative in Congress for the Second Congressional District, filed in the Circuit Court for Anne Arundel County on September 14, 1950, their petition for a writ of mandamus against the Secretary of State. They alleged that they possessed the necessary qualifications for the respective offices for which they had been nominated and had presented their certificates of nomination on August 18, 1950 (Gerende on August 31, 1950) with the proper filing fees to the Secretary of State who is charged with the duty of receiving such certificates, but that said cer-

tificates were rejected because of the failure of all of the petitioners to file the affidavit required by Sec. 15 of Article 85A of the Code, as enacted by Chapter 86 of the Acts of 1949, officially called the Subversive Activities Act of 1949, and familiarly known to the citizens of the State as the "Ober Act". The petition showed that some time after the said rejection, the petitioners Fox and Jones filed the required affidavits under protest, but the other petitioners did not. They ask that the Secretary of State be directed by writ of mandamus to accept the nomination of the petitioners without filing the affidavits, contending that the provisions of the Ober law requiring them are invalid.

The case was heard before Associate Judge Clark of the Fifth Judicial Circuit upon a demurrer filed by the Secretary of State. He sustained the demurrer and dismissed the petition on October 9, 1950 because the petitioners could not amend. From that order, all of the petitioners have appealed.

We advanced the case on account of the necessity of having the matter determined before the election and in time to make any necessary insertions in the ballots and voting machines. The case was fully argued before us on October 12, and on the same day, we passed a per curiam order by the terms of which the appeals of Jones and Fox were dismissed; the order of the court was affirmed as to Shub, but reversed as to Gerende. The reasons for that decision are now given.

It is perfectly apparent that as to Jones and Fox, the case is moot. They chose to make affidavits rather than stand on the legal questions they raised, and their certificates were accepted. As to them, it does not now matter whether the action of the Secretary of State in declining to receive those certificates without the affidavits was correct or not. For that reason their appeals were dismissed.

The petitioner Shub is a candidate for a state office. The petitioner Gerende is a candidate for a Federal office, and there is a distinction between the two cases

which, in our opinion, makes Sec. 15 operative as to Shub, but not as to Gerende.

Chapter 86 of the Acts of 1949 has already been before this court in two cases, *Hammond v. Lancaster*, 194 Md. 462, 71 A. 2d 474, 481, and *Hammond v. Frankfeld*, 194 Md. 487, 71 A. 2d 482. The first of these cases was a class suit brought by various professors and other citizens who were taxpayers of the State. The second suit was brought by the chairman and labor secretary of the Communist Party who also sued as taxpayers. The majority of the court held that in neither case did the complainants have any standing to raise the questions they did, except that as to the validity of the subsequent act, Chapter 310 of the Acts of 1949, which put Chapter 86 in effect at once. The court, in the *Hammond-Lancaster* case said: "We conclude that, upon the adoption of Chapter 310, Chapter 86 became effective on April 22, 1949, as an emergency law and remains in force unless and until repealed by the voters." All of the questions which are raised in the present case were fully and expressly argued in the two previous cases, although no decision was made on them. The question of the validity of Sec. 15 is now clearly raised before us by parties who have a direct interest in its decision. It reads as follows: "No person shall become a candidate for election under the provisions of Article 33 of the Annotated Code of Maryland to any public office whatsoever in this State, unless he or she shall file with the certificate of nomination required by the foregoing Article, an affidavit that he or she is not a subversive person as defined in this article; provided that, in the case of certificates of nomination for President or Vice President of the United States, the affidavit may be made on behalf of such candidates by those persons who file the certificate of nomination for such candidates. No certificate of nomination shall be received for filing by any Board of Supervisors of Elections or by the Secretary of State of Maryland unless accompanied by the affidavit aforesaid, and there shall not be entered upon any ballot or voting machine at any

election the name of any person who has failed or refused to make the affidavit aforesaid."

It is contended that the affidavit required by this section is contrary to Article 37 of the Maryland Declaration of Rights. That article provides that no religious test ought ever to be required as a qualification for any office of profit or trust in this State other than a declaration of belief in the existence of God, "nor shall the Legislature prescribe any other oath of office than the oath prescribed by this Constitution." The oath prescribed by the Constitution is found in Sec. 6 of Article 1, which states that every person elected or appointed to any office of profit or trust under the Constitution or under the laws pursuant thereto shall, before he enters into the duties of such office, take and subscribe the oath or affirmation therein set out. This oath is to the effect that the subscriber will support the Constitution of the United States, that he will be faithful and bear true allegiance to the State of Maryland and support the Constitution and laws thereof, and that he will to the best of his skill and judgment diligently and faithfully, without partiality and prejudice, execute his office according to the Constitution and laws of this State, and, if he is a governor, senator, member of the House of Delegates, or a judge he is to further state that he will not directly or indirectly receive the profits or any part of the profits of any other office during his term. The appellants say that the affidavit required by Sec. 15 of Article 85A is an additional oath of office, containing matter not included in Article 1, Sec. 6, and therefore prohibited by Article 37 of the Declaration of Rights.

The purpose and history of Article 37 was discussed by Chief Judge McSherry in the case of *Davidson v. Brice*, 91 Md. 681, 48 A. 52. It was there held that the omission from the Declaration of Rights of 1867 of the authority contained in every antecedent declaration of rights giving the Legislature the power to impose an official oath was deliberate, and its purpose was to permit the citizens of the State who had been in sympa-

thy with the Confederate States of America to hold office without having to take the test oaths which had previously been required by the Legislature under the Constitution of 1864.

It may be noted that Article 37 does not prohibit candidates for office from being required to make affidavits as to their qualifications. It has been the practice and custom and statutory requirement for many years to demand from candidates at the time of filing for office certificates under oath with respect to their various qualifications. Such provisions are set out in Article 33 of the Code, and these sworn certificates have never been considered as additional oaths of office. The filing of such certificates is made a prerequisite to the placing of a candidate's name upon the ballots or in the voting machines. (Art. 33, Sec. 53(a) as enacted by Chapter 425 of the Acts of 1949). Their requirement is a method by which the Legislature is executing what has been held to be its inherent power to safeguard elections. *Kenneweg v. Allegany County Commissioners*, 102 Md. 119, 62 A. 249; *Munsell v. Hennegan*, 182 Md. 15, 31 A. 2d 640; *Hennegan v. Geartner*, 186 Md. 551, 47 A. 2d 393. The purpose is to keep from the ballots and voting machines the names of those who are ineligible for office.

In the case of *Rasin v. Leaverton*, 181 Md. 91, 28 A. 2d 612, 614, this court upheld the action of the Board of Supervisors of Elections of Kent County in refusing to place upon the ballot the name of a candidate for state's attorney who was not constitutionally eligible for that office. In so holding, this court, speaking through Chief Judge Bond, referred to the case of *Hummelshime v. Hirsch*, 114 Md. 39, 79 A. 38, involving the election of a member of the City Council of Cumberland, and, speaking of that case, said: "It was held that the candidate was disqualified, the court considering that the obvious purpose of the provision, and of *that requiring candidates for nomination at the primary election to swear that they were qualified to hold office, was to secure*

*to voters or electors the right to vote for those qualified under the charter."* (Emphasis supplied.)

In *Hummelshime v. Hirsch,* 114 Md. 39, 79 A. 38, 45, the full statement on this subject is as follows: "What could be the object of requiring the candidates for nomination at the primary election, before their names go on the ballots, to swear that they are qualified to hold the office, except to eliminate from the primary contest those who do not possess the required qualifications, and to thereby secure for the final election candidates having the requisite qualifications? The obvious purpose of these provisions is to secure to the voters or electors the right to vote for those qualified under the charter for the offices for which they are candidates, * * *."

It therefore appears that the Legislature has performed a duty, owing to the voters of the State in requiring from those who seek their suffrages proof in advance, so far as it is possible to get it, that if they are elected, they will be able to hold the office they seek.

It is earnestly contended, however, that the affidavit required by Sec. 15 is not only an affidavit for the purpose of keeping the ballots and voting machines clear of unqualified persons, but it is in effect an additional oath of office because some of those who take it must be elected to the respective offices voted for, and those particular persons are thereby required to take two oaths of office; one, the constitutional oath, and the other, the oath to the affidavit required by Sec. 15. Except for one other consideration which we are about to discuss, there might be some force in this argument if the affidavit was required of only those elected, but it seems clear that both the purpose and the actual wording of Sec. 15 negative this contention.

The other consideration is that before the passage of Chapter 86 of the Acts of 1949, the voters of this State had, in November, 1948, amended the Constitution by adding to it Article 15, Sec. 11, which reads: "No person who is a member of an organization that advocates the overthrow of the Government of the United States or

of the State of Maryland through force or violence shall be eligible to hold any office, be it elective or appointive, or any other position of profit or trust in the Government of or in the administration of the business of this State or of any county, municipality or other political subdivision of this State."

A person who advocates the overthrow of the Government of the United States, or of this State, through force or violence could scarcely in good faith, take the constitutional oath of office prescribed by Article 1, Sec. 6, and the Legislature has taken pains to see that the name of any such unqualified person shall not appear on the ballot.

Appellants contend that the wording of Sec. 15 goes much further than the constitutional amendment, and that if Sec. 15 is viewed as an implementation of the constitutional provision, it will be seen that its provisions exceed those made by the people in that amendment. They attempt to justify this contention by the fact that the affidavit required by Sec. 15 is that the person making it is not a subversive person as defined in Chapter 86, and that the definition of "subversive person" as contained in that act is any person who commits, attempts to commit, or aids in the commission, or advocates, abets, advises, or teaches, by any means, any person to commit, attempt to commit, or aid in the commission of, any act intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of the constitutional form of the Government of the United States or of the State of Maryland, or any political subdivision of either of them, by revolution, force, or violence, or who is a member of a subversive organization or a foreign subversive organization. They contend that the addition of the word "revolution" to the words "force or violence" prohibits any one from advocating or teaching the alteration of the form of government by a *peaceful* revolution; that is, by some change which would be revolutionary in its nature, but which would not be accomplished by force or violence.

With that contention we are unable to agree. It is quite clear from the connotation that "revolution" as used in Section 15 does not mean a peaceful revolution, but means a revolution accomplished by force or violence. These words are to be construed together. Were there any doubt of this, it would be resolved by the title which uses the words "violence or other unlawful means". The title of a statute, in a doubtful case, will limit an act to what the title intends. *Baltimore v. Deegan,* 163 Md. 234, 161 A. 282. *Buck Glass Co. v. Gordy,* 170 Md. 685, 185 A. 886. *Brooklyn Apartments, Inc., v. Mayor & City Council of Baltimore,* 189 Md. 201, 55 A. 2d 500.

Another contention that Section 15 is more extensive than Article 15, Section 11, is that a subversive person also means a member of a foreign subversive organization, and the definition of a foreign subversive organization is any organization directed, dominated, or controlled directly or indirectly by a foreign government, the purpose of which is to advocate the overthrow, destruction, or alteration of the constitutional form of the government, and to establish in its place any form of government the direction and control of which is vested in the domination of any foreign government, etc. They note the absence in this definition of any reference to force or violence, and say that this would prohibit, for instance, a labor organization which is under the control of the labor government of Great Britain from advocating an alteration or change in the form of the government of the United States by means of a constitutional amendment which would give some dominion over this country by Great Britain. It is easy to be meticulous when you are attempting to dissect a statute and are trying to evade its provisions, but the proper rules of statutory construction require that all of its provisions be interpreted in accordance with the intent and meaning of the entire enactment. The Legislature has indicated its purpose in passing Chapter 86 not only by the title, but also by the preamble. This preamble recites the existence of a world Communist movement for domi-

nation by a foreign power, and the methods used, and the objects attempted to be attained by that power are, in the opinion of the Legislature, a sufficient basis of the necessity for the passage of the act. An act passed by the Legislature for such a purpose comes to us "encased in the armor wrought by prior legislative deliberation." *Bridges v. California*, 314 U. S. 252, at page 261, 62 S. Ct. 190 at page 193, 86 L. Ed. at page 202, approved and quoted in *American Communications Association v. Douds*, 339 U. S. 382, 401, 70 S. Ct. 674, 685, 94 L. Ed. 925, 945, to which is added by Chief Justice Vinson, who delivered the opinion in the latter case, the words: "The deference due legislative determination of the need for restriction upon particular forms of conduct has found repeated expressions in this Court's opinions." The purpose of Chapter 86, as shown by its title and throughout its provisions, is not to restrict freedom of speech or thought, nor does it do so. The purpose of Section 11 of Article 15 of the Constitution, and of Chapter 86 of the Acts of 1949, is the same and they are to be construed together to effect that purpose. That is to prevent infiltration in our state, county, or municipal governments of persons who are engaged in one way or another in the attempt to overthrow the government *by force or violence*. We construe the affidavit required by Sec. 15 with respect to those desiring to become candidates for public office as a means of preventing such infiltration at its initial stage, thereby preventing confusion among the electors and that it is, in no sense, an additional oath of office.

As representing the contrary view, the recent case of *Imbrie v. Marsh*, 3 N. J. 578, 71 A. 2d 352, 355, decided by the Supreme Court of New Jersey is cited. That case represents a construction of the New Jersey constitution and statutes by the highest court of that state and is in no sense binding upon us, although it is entitled to respect both by reason of the ability of the members of the court and because of its reasoning. We do not

think, however, that it is on all fours with the case we are considering.

The New Jersey constitution prescribes an oath for members of the Legislature and another similar oath for all state officers. It contains no prohibition against additional legislative oaths of office. The Legislature, however, attempted to require another oath of all persons required by law to give assurance of fidelity to the Government of the State. This oath stated among other things that the affiant did not *believe in* or advocate the use of force or violence to overthrow the government. A similar oath was required by another statute to be taken by the Governor and every person elected or appointed to any public office or in any public position. Another statute required all candidates for nomination or election to any public office to subscribe and file such an oath, and provided further that should any candidate fail to file the oath, his nomination or election would be void. A fourth statute provided that in the event of the failure of any candidate for public office to so subscribe and file there should be printed under his name on the ballot a legend "Refused Oath of Allegiance". It will be noted that the oaths were required not only of candidates, but of those elected. In the majority opinion, delivered by Chief Justice Vanderbilt, no distinction is made, or even suggested, between candidates and elected officials. The oaths are all treated as oaths of office, and the question before the court and its answers were thus stated:

"Are these oaths, embodied in the Constitution of 1947, exclusive as to the members of the Legislature and State officers and therefore beyond the power of the Legislature to add to, subtract from, or in anywise vary?

"To ask the question is to answer it, for if the Legislature may alter these oaths or any other provisions of the Constitution prescribing the qualifications for office (such as age, citizenship, residence and prohibition of dual office holding) it would to the extent of such variance nullify the Constitution. The maxim *expressio unius est exclusio alterius,* is peculiarly applicable here. Such has

been the current not only of decisions in this State and elsewhere but of the authorities on public law."

It is not necessary for us to disagree with this general statement of statutory construction, although Chief Justice Marshall, in speaking of the oath exacted in the Constitution of the United States, said that he would be charged with insanity who should contend that the Legislature might not super-add to the oath directed by the Constitution such other oath of office as its wisdom might suggest. *M'Culloch v. Maryland*, 4 Wheaton 316, at page 416, 4 L. Ed. 579, at page 604. The prohibition against another oath of office in Maryland is not implied, but is directly and explicitly stated in the Constitution itself.

The result of the New Jersey decision was to hold unconstitutional so much of the challenged legislation as was applicable to the Governor, the members of the Legislature and candidates for those offices. The minority opinion of two justices agreed with this conclusion as to members of the Senate and General Assembly, but did not agree that the statutes were unconstitutional which were applicable only to candidates for office. These, it held, were valid means of informing the voters of the beliefs of candidates.

The essential difference between this case and the one before us is that there is no constitutional provision in New Jersey, similar to our Article 15, Section 11, providing a loyalty qualification for the holding of public office. Had there been, it is submitted that the challenged oaths, whether considered as "oaths of office" or not, could not have been stricken down for the sole reason given by the court, namely that the Legislature was prescribing other and different qualifications for office than those set out in the constitution. The New Jersey decision, therefore, is not authority against the affidavits we are here considering.

Appellants also attack Chapter 86 as a whole on various grounds, all of which were discussed in appellee's brief filed in the *Hammond v. Lancaster* case, supra, to which

reference is made by appellants here. These grounds are that it abridges the fundamental rights of freedom of speech, press and assembly, that it is vague and indefinite and therefore violates due process, that it is a bill of attainder, that it attempts to establish guilt by association, and other similar contentions. It is contended that the act is basically inseparable in its provisions, and, therefore, it should be stricken down in its entirety.

If we assume that these appellants have any standing in this case to make these contentions (which we do not decide) we think they have been recently fully discussed and disposed of in three recent decisions by the Courts of the United States. These are *Dunne v. United States,* 8 Cir., 138 F. 2d 137 and *United States v. Dennis,* 2 Cir., 183 F. 2d 201 passing upon the Smith Act, 18 U. S. C. A. § 2385, and *American Communications Association v. Douds, supra,* 339 U. S. 382, 70 S. Ct. 674, 94 L. Ed. 925, which approved the oath required by the Taft-Hartley Act, 29 U. S. C. A. § 141 *et seq.* We do not think it necessary to repeat what has been said in these cases. We are unable to find that the statute before us, on its face, violates any of the fundamental rights of appellants, or that it is susceptible of an interpretation which makes it necessary for the courts to strike it down. On the contrary, there is a presumption in favor of its validity, and there has been presented to us no argument which impairs or rebuts that presumption.

The foregoing discussion is applicable to the case of the appellant Shub, but a different situation exists as to the appellant Gerende. The qualifications of a representative in Congress are set out in Section 2 of Article I of the Constitution of the United States. A representative must have attained the age of 25 years, must have been seven years a citizen of the United States, and must, when elected, be an inhabitant of the state in which he shall be chosen. No other qualifications are prescribed, and by Section 5 of Article I, it is provided that each House of Congress shall be the judge of the qualifications

of its own members. Members of Congress take the oath prescribed by Article VI of the Constitution of the United States, not the oath required by Section 6 of Article 1 of the Maryland Constitution. Article 37 of the Maryland Declaration of Rights does not apply to them. Nor does Section 11 of Article 15 of our constitution apply, because that is limited to offices and positions under the government of this State or its counties, municipalities, or other political subdivisions.

While Section 15 of Chapter 86 might in its terms be broad enough to cover candidates for Congress, such a construction would bring it in conflict with the Federal constitution, and we think therefore it cannot be properly so construed. Candidates for Federal offices must comply with state election laws before their names can be placed upon the ballot, *Vaughn v. Boone,* 191 Md. 515, 62 A. 2d 351, but this does not authorize the State to include in the election or other laws of the State any requirement which would add additional qualifications to the office. There is nothing in the United States Constitution which in terms prevents a member of Congress from being a subversive person who seeks to overthrow the government of the United States by force or violence. If that is a disqualification, it must be determined by Congress itself and not by a state legislature or by a state court. This conclusion is supported by the applicable decisions.

Thus in Minnesota, it has been held that a felon, disqualified for public office under the state constitution, is not thereby prevented from being placed upon the nominating election ballot for the office of United States senator. *State ex rel Eaton v. Schmahl,* 140 Minn. 219, 167 N. W. 481. In Oregon, a judge, prohibited by his oath of office from accepting any other office during his term, was held not to be thereby barred from becoming a candidate for the office of representative in Congress. *Ekwall v. Stadelman,* 146 Oregon 439, 30 P. 2d 1037. In that case there is quite a full discussion of the subject, with citations from Story, Kent and Cooley, and the

case of *Lamar v. U. S.*, 241 U. S. 103, 36 S. Ct. 535, 60 L. Ed. 912, is cited as authority for the conclusion that a representative is an officer of the United States and not of the state. In New York, Earl Browder filed a nominating petition as a candidate for representative in Congress and it was contended that he was ineligible as a candidate because he openly espoused international communism, and that it was against public policy for him to have a seat in the Congress of the United States. The New York court said that was not a disqualification under the United States Constitution. It was also contended that Browder had been convicted in the United States Court and was therefore barred under the state law, but the court said that this disqualification did not extend to Federal offices. *In re O'Connor*, 173 Misc. 419, 17 N. Y. S. 2d 758. Similarly, it was held in Washington that the State could not prevent a judge from running for Congress by a statute which made him ineligible for any other office or employment during his term. *State v. Howell*, 104 Wash. 99, 175 P. 569. In Nebraska, it was held that while the election laws of that state prohibited a defeated candidate for governor from having his name put on the ballot by petition for the office of United States senator, the court was careful to say that this was a method of nomination which the state law controlled, and that, while he could not have his name printed on the official ballot, his name could be written in, and if sufficient numbers of people voted for him, he could be elected. *State v. Swanson*, 127 Neb. 806, 257 N. W. 255. In Wisconsin, it was held that Joseph R. McCarthy, who, as a judge, was prohibited from holding any office during his term, was not thereby prohibited from being nominated by the Republican Party for the office of United States senator. *State v. Zimmerman*, 249 Wis. 237, 24 N. W. 2d 504. A similar ruling was made in Arizona. *Stockton v. McFarland*, 56 Ariz. 138, 106 P. 2d 328. In Wyoming, it was held that a provision that the governor should not be eligible for any other office during his term did not prevent him

from becoming a member of the House of Representatives or the United States Senate. *State v. Crane*, 65 Wyo. 189, 197 P. 2d 864.

It appears, therefore, upon reasoning and authority, that a state cannot in any manner impose additional qualifications upon a candidate for representative in Congress, but that any one who is qualified under the United States Constitution may become a candidate, subject, of course, to reasonable provisions of time and method of getting his name upon the ballot. The making of the affidavit required by Section 15 is a reasonable safeguard of our state elections because it prevents the names of ineligible persons from being presented to the voters. That reason, as we have shown, does not apply to a candidate for representative in Congress because there is no such disqualification as to that office as there is to our state offices. Whatever may be the subversive activities of such a candidate, she is not ineligible unless the House of Representatives itself so holds. We have therefore been unable to approve the action of the trial judge in denying the appellant Gerende a place upon the ballot or in the voting machines, but have concluded that he erred in that respect and that she is entitled to have her name presented to the electors without making the affidavit required by Section 15.

MARKELL, J., delivered the following dissenting opinion, as to Louis Shub, in which HENDERSON, J., concurred.

Section 6 of Article 1 of the Constitution of Maryland provides: "Every person elected or appointed to any office of profit or trust, under this Constitution, or under the laws, made pursuant thereto, shall, before he enters upon the duties of such office, take and subscribe the following oath or affirmation: [setting out the words of the oath]." Section 1 of Article 6 requires the Comptroller and the Treasurer to "take such oath * * * as [is] now, or may hereafter be prescribed by law". Article 37 of the Declaration of Rights provides: "That no religious test ought ever to be required as a qualifica-

tion for any office of profit or trust in this State, other than a declaration of belief in the existence of God; nor shall the Legislature prescribe any other oath of office than the oath prescribed by this Constitution." Section 15 of the Ober Act provides that no person shall become a candidate for election to any public office whatsoever in this State unless he shall file with his certificate of nomination an affidavit that he is not a "subversive person", as defined in the act. Our duty is to set the statute beside the constitution and determine whether or not the affidavit required by section 15 is forbidden by Article 37. Zeal or lack of zeal on our part for hunting and catching Communists would not justify us in distorting the plain meaning of Article 37 in order to uphold or strike down the statute.

This court has held that Article 37 means what it says and is not narrowed by the history and purpose behind it. In *Davidson v. Brice*, 91 Md. 681, 48 A. 52, a requirement in an act of 1894 that the county treasurer of Anne Arundel County take an oath "in form similar to that heretofore taken by collectors of taxes" was held contrary to Article 37 and invalid. The oath taken by collectors had been prescribed (with successive changes) by Acts of 1841, 1847, 1874 and 1888. Code of 1860, art. 81, sec. 36; Code of 1888, art. 81, sec. 36. This provision was again reenacted in 1900 and remained in the Code until repealed by the tax revision act of 1929. Code of 1924, art. 81, sec. 44. The court, in its opinion by Chief Judge McSherry, asks and answers the question, "has the legislature the authority to prescribe, as a qualification for the office of county treasurer, any other oath than the one which section 6, art. 1, of the constitution imposes?", and after quoting art. 1, sec. 6, and art. 37, says, "Here, then, is an explicit limitation on the power of the legislature. In the face of this positive and plain inhibition, how can it be insisted that the legislature may impose as a qualification for a public office some other and additional oath 'than the oath prescribed by the constitution'? If it may require the county

treasurer to take the oath prescribed by the Code for tax collectors, it may with equal propriety superadd some other and widely-different oath, and completely nullify the restrictive clause of article 37 of the declaration of rights. It was the obvious purpose of the people who adopted the constitution of 1867 to deprive the legislature of any power to formulate or impose an oath of office, except as respects the state comptroller and the state treasurer, each of whom, under section 1, art. 6, of the constitution, is required to 'take such oath and enter into such bonds * * * as are now, or may hereafter be, prescribed by law.'

"The significance of the restrictive clause in article 37 of the declaration of rights is conspicuous if antecedent constitutions of the state are consulted, and if the history of the disturbed period covering the Civil War and just preceding the adoption of the constitution of 1867 be recalled. * * * There can be no doubt that the legislature had, under the declarations of rights of 1776, 1851, and 1864, the authority to prescribe oaths of office and in many instances this authority was exercised. When the convention of 1867 assembled, it was a common belief that many of the official oaths which the legislature had previously prescribed in the exercise of an undoubted power were needlessly stringent, and this sentiment found expression in that provision of the declaration of rights which, by prohibiting any other official oath than the one set forth in the constitution itself, took away from the general assembly the power to adopt or require an additional one. The omission from the declaration of rights of 1867 of the authority contained in every antecedent declaration of rights, giving the legislature the power to impose an official oath, was deliberate; and, to give emphasis to the design of the framers of the constitution, a positive prohibition, introduced for the first time, was substituted for the rejected clause. * * * No office, however created, can be assumed until an official oath is taken; and *no* official oath other than that set forth in the constitution can be

required, because that is the only one prescribed by the constitution, and all others are prohibited by the declaration of rights. Article 37 does two things: It prohibits any religious test as a qualification for any office of profit and trust, other than a declaration of belief in the existence of God; and it prohibits *any* oath of office other than the one set forth in section 6, art. 1, of the constitution, except as respects the comptroller and treasurer. By no known rule of interpretation can these prohibitions be confined to offices specifically created by the constitution, nor can they be restricted to a narrower scope than their plain words indicate. * * *'' 91 Md. 681, 687-691, 48 A. 54. [All italics in the original.] See also *Keyser v. Upshur*, 92 Md. 726, 728, 48 A. 399.

*Davidson v. Brice* has never been modified or qualified. In *Hummelshime v. Hirsch,* 114 Md. 39, 57, 79 A. 38 and in *Rasin v. Leaverton,* 181 Md. 91, 95, 28 A. 2d 612, no question was presented or decided, and nothing was said, regarding the validity of any requirement of an oath by a candidate for office. In each of those cases the question was the construction, not the validity, of statutory or constitutional qualifications for office, in the one case as to assessment for and payment of taxes, in the other as to residence. It was held that the qualifications must be possessed not merely at the time of taking office, but at the time of the election—not, however, at the time of filing a certificate of candidacy before the primary election. In *Keyser v. Upshur,* 92 Md. 726, 728, 48 A. 399, it was held that a statutory requirement of an oath, as such invalid under Article 37, might be regarded as imposing a duty to do the things specified in the oath. The Cumberland charter provision, referred to in the *Hummelshime* case as requiring candidates to swear that they were qualified to hold office, actually did not require a candidate to swear to anything. It required a sworn statement to be filed by the candidate "or * * * for him'' 114 Md. at page 41, 79 A. at page 39, as is also shown in the form of oath set out. That oath as to qualifications

for office could be made regarding a stranger, on the strength of objective evidence from tax records and registers of voters.

An oath which must be taken in order to obtain an office is an oath of office. The fact that such an oath may be more than an oath of office, *e.g.*, a requirement from all candidates, successful or unsuccessful, does not make it any less an oath of office. As was aptly said by Judge Sherbow in the lower court in *Lancaster v. Hammond*, "The Subversive Activities Act of 1949 seeks to do by indirection that which cannot be done directly. It is obvious that of all the candidates who file for office, one will be successful. The law forbids an additional oath of the elected official. To allow the oath of all the candidates, knowing one will be the successfully elected official, is to nullify the restriction of Article 37 of the Declaration of Rights. This is in the face of the plain and positive inhibition of the law. It means we no longer look to the substance but adopt the form which destroys the substance." The Supreme Court of New Jersey, in its summary statement, quoted in the opinion of this court in the instant case, supra, 76 A. 2d 339, of the question presented and its answer, treated any distinction between requirement of an oath from persons who take office and from candidates for office, as not calling for mention. Without mentioning any such distinction in question, answer or reasoning the court applied alike its reasoning and conclusion to four separate statutes, two relating to certain persons who take office, two to candidates for office. *Imbrie v. Marsh,* 3 N. J. 578, 584-592, 71 A. 2d 352.

In the opinion of this court in the instant case, and the minority opinion in *Hammond v. Lancaster,* 194 Md. 479, 481-482, 71 A. 2d 484-485, section 15 of the Ober Act is said not to violate Article 37, (1) because it prescribes, not an oath of office, but an oath for all candidates for office, and (2) because its purpose is to "implement" the 1948 constitutional amendment, art. 15, sec. 11, proposed by Acts of 1947, ch. 721, by requiring

of candidates an oath to the effect that they possess the qualification for office prescribed by that amendment. Whether these are two reasons or one is not altogether clear. Neither reason nor both combined is a valid reason.

*Davidson v. Brice* discloses four instances, *Keyser v. Upshur* another, in which the legislature, evidently by inadvertence, not in defiance of Article 37, enacted or reenacted a forbidden statutory requirement of an oath of office. It would not be surprising if other instances could be found among the statutes of the last eighty-two years. None has come to our attention. The nearest approach to one is the provision in the Cumberland charter mentioned in the *Hummelshime* case. Nevertheless, in the opinion of the court in the instant case, it is said, "It has been the practice and custom and statutory requirement for many years to demand from candidates at the time of filing for office certificates under oath with respect to their various qualifications. Such provisions are set out in Article 33 of the Code, and these sworn certificates have never been considered as additional oaths of office. The filing of such certificates is made a prerequisite to the placing of a candidate's name upon the ballots or in the voting machines. (Art. 33, Sec. 53 (a) as enacted by Chapter 425 of the Acts of 1949.) Their requirement is a method by which the Legislature is executing what has been held to be its inherent power to safeguard elections. [Citing three cases.]" These statements are not accurate. The cases cited discuss a great variety of election law requirements, but do not mention an affidavit by candidates as to their qualifications. Nor does section 53 (a) of Article 33, or any other cited provision in Article 33. The difference between an acknowledgment of the authenticity of an instrument and an affidavit to the truth of its contents needs no explanation; it has been familiar, in the recording laws, to lawyers and scriveners for almost two hundred years. So far as appears, it has never been a statutory requirement to demand from candidates cer-

tificates as to their qualifications, sworn to by them. For the reason already stated, there is no real difference between a forbidden oath of office and a required oath by candidates for office.

More novel, but not more substantial, is the distinction between a forbidden oath of office and an oath by candidates for the purpose of "implementing" the 1948 constitutional amendment by their oath that they possess the qualification for office prescribed in the amendment. Violation of the constitution cannot be justified by the purpose of violating it. One constitutional provision may not be violated in order to "implement" another. An oath as to qualifications for office is itself an added qualification. As was said in *Davidson v. Brice* [91 Md. 681, 48 A. 53], prescribing "as a qualification for the office * * *, any other oath" is precisely what is forbidden by Article 37. A distinction between an oath of office and an oath to supplement other qualifications for office is, like a distinction between "begin" and "commence", a distinction without a difference. If the legislature, when it proposed the 1948 amendment, or when it adopted the resolution directing appointment of the commission, had considered it advisable so to supplement the amendment, this could easily have been done by adding to the proposed amendment, or proposing as a separate amendment, a requirement that every candidate for office take an oath that he "is not a member of an organization that advocates the overthrow of the Government of the United States or of the State of Maryland by force or violence." In such event the "implemented" amendment or the original amendment and the "implementation" could have been submitted to the voters at the 1948 election.

Furthermore, the premise for this alleged distinction, *viz.*, that section 15 of the Ober Act covers only the same subject matter as the 1948 amendment, is without basis in law or in fact. It is not necessary to pursue the details of the argument to support this premise. The elaborate definition of "subversive person" embodies the still more elaborate definitions of "subversive organization" and

"foreign subversive organization" (which does not mention "force or violence" at all), but (it is said) means only "a person who is a member of an organization that advocates the overthrow of the Government of the United States or of the State of Maryland through force or violence." If a statute is ambiguous, the courts, among possible constructions, select one that will avoid constitutional difficulties. But this doctrine furnishes no warrant for discarding the carefully chosen words of the Ober Act as verbiage. It is unbelievable that the legislature which directed the commission to study the laws of the United States and other states and formulate legislation, the commission which spent months in so doing, the manifestly skilled and careful draftsman of the act and the legislature which enacted it all spent their time and labor and spilled hundreds of words on circumlocutions of the 1948 amendment, only to darken counsel by words without meaning. I do not intimate any opinion on the question how far, under the separability provision (sec. 18) in the Ober Act, section 15 or the definition of "subversive person" might be held valid in part or in some applications of it and invalid in part or in other applications. See, *e.g., American Communications Ass'n, v. Douds,* 339 U. S. 382, 422, 70 S. Ct. 674, 94 L. Ed. 925, opinion of Mr. Justice Frankfurter.

It is said that an act passed by the legislature comes to us "encased in the armor wrought by prior legislative determination." This recent "flourish of rhetoric" purports to be an expression of judicial humility in considering the validity of legislative action, not an invitation to usurp legislative power by ignoring the words of the legislature and rewriting a statute.

The decision (as to Shub) in the instant case is unsupported by authority. The decision of the Supreme Court of New Jersey is flatly to the contrary. The New Jersey constitution contains a provision for an oath, substantially identical with art. 1, sec. 6 of the Maryland constitution, but no express prohibition, like art. 37, of any other oath. The court, however, held that

the provision for an oath prohibited by implication any other oath, and it held invalid all four statutes which required oaths from persons who take office or become candidates for elective office.

I concur in the result as to Thelma Gerende. The State of Maryland has no more authority to prescribe qualifications for a member of Congress than for the Prime Minister of Canada or Russia. But for the proviso in section 15 relating to candidates for President or Vice President of the United States, that section might be construed as applicable only to elections for state offices. The proviso, however, manifests an intent that section 15 apply to all other federal offices. If section 15 were really only a legitimate "safeguard of elections" against fraud, it would be equally valid as to elections for state or federal offices.

If section 15 is not (as I believe it is) invalid under Article 37, then the federal questions raised must be decided. The Supreme Court already has denied an immediate hearing on appeal in the instant case; presumably it may dismiss the case as moot after the election. *Jones v. Montague,* 194 U. S. 147, 24 S. Ct. 611, 48 L. Ed. 913. On the other hand, if section 15 is now authoritatively construed (as I think it should not be) as meaning only what the 1948 amendment says, then the federal questions have been materially narrowed. Most of the federal questions have been raised under the First Amendment, as included in the due process clause of the Fourteenth, or otherwise under the due process clause. Only the Supreme Court can authoritatively decide these federal questions. Some of them may be decided or illumined in cases now pending in that court. I express no opinion on any federal questions under the due process clause.

I agree that section 15 is not a bill of attainder or an *ex post facto* law.

I think the judgment should have been reversed as to both Shub and Gerende.

HENDERSON, J., authorizes me to say that he joins in this opinion.